Charles E. REED, Joyce Reed, Verda Goudzwaard, Ruth Dykstra, Lorraine Dykhouse, Tino J. Caviggiola, Joan Caviggiola and Robert L. Hulsebus, Plaintiffs,

v.

Jack VAN HOVEN, Jack E. Kalee, Cornelius Dood, Grant W. Siler, Paul R. Steimle, Glenn Nykerk, and Jenison Public School District No. 30, Defendants.

Civ. A. No. 4787.

United States District Court
W. D. Michigan, S. D.

Jan. 8, 1965.

Warner, Norcross & Judd, Grand
Rapids, Mich., Harold S. Sawyer and
Thomas J. McNamara, Grand Rapids,
Mich., of counsel, for plaintiffs.

Varnum, Riddering, Wierengo &
Christenson, Grand Rapids, Mich.,
Laurent K. Varnum, Grand Rapids,
Mich., and Jon F. DeWitt, of counsel, for
defendants.

FOX, District Judge.

Plaintiffs are parents of children cur-
rently enrolled in the public schools of
the Jenison School District, Ottawa
County, Michigan. Defendant Nykerk is
the Superintendent of Schools for the
Jenison Public Schools; the other de-
fendants are members of the Board of
Education of the Jenison Public Schools.

Plaintiffs instituted suit under the First and Fourteenth Amendments to the Constitution of the United States, claiming that certain practices in the Jenison Public Schools violate both the free exercise and establishment clauses of the First Amendment.

Subsequent to the filing of this suit, a new policy with respect to the religious practices was adopted and put into operation in the Jenison Public Schools. Defendants claimed that the controversy was ended by that policy, and moved for a summary judgment.

Plaintiffs have requested an injunction to prevent any exercises of a religious nature from being conducted.

At a hearing, this court denied the defendants' motion for a summary judgment, and did not grant plaintiffs' request for an injunction, suggesting to the parties a substitute policy which laid out the broad outlines of a program allowing an accommodation to those children who wished to pray, provided such exercises were conducted and completed outside the hours of the regular school day.

After a short period of time, the plaintiffs again appeared before the court, objecting to the substitute policy as implemented by the school board.

The board, in attempting to apply the policy, was faced with a school bus problem in allowing the exercises to take place in the morning, before school began.

The busses serving the Jenison School District also serve the neighboring school districts, and therefore, the bus schedules were rigid, and children attending the Jenison Schools continued to arrive at the same time as they had before the attempt to carry out the court-suggested policy.

Consequently, in order to provide for a working accommodation, the School Board changed "the bell and beginning of school timing" as illustrated by the procedure inaugurated in the Sandy Hill School: at 8:40 A.M. a warning bell sounds, followed by another bell at 8:45 A.M. to indicate that the home rooms are open for the use of those children desiring to pray. At 8:50 A.M. a third bell rings, signifying the end of the voluntary prayer period and additionally, that school is about to begin. At 9:00 A.M. a bell signifying the actual start of the class day is rung.

Plaintiffs object to these practices, claiming that they raise problems of excusal and segregation which are constitutionally prohibited.

By this opinion, the court will attempt to clarify its suggestion for an interim procedure.

The policy initially proposed by defendants purported to establish a position of neutrality on the part of the Board of Education with respect to religion.[1]

The Supreme Court of the United States, in the cases of Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601, and Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844, has been called to rule upon

1. 1. Upon the request of any student or parent of a student in any particular class that the individual be allowed prayer and/or Bible reading as a regular religious exercise at the opening of school, the teacher must devise reasonable rules and regulations controlling such exercise.
   2. The rules and regulations devised to implement the requested exercises may vary, depending on the number of children or parents so requesting, from allowing a moment of reverent silence to allowing prayers in unison, aloud. In the event the teacher finds that divergent, requests preclude reasonable control, the teacher may always allow as a satisfactory substitute, a moment of reverent silence.
   3. Depending upon the form of requested exercise permitted in the discretion of the teacher, those who object shall remain in the class, or be excused from the requested exercise, or may arrive at class late, as the teacher feels will best serve classroom procedures and minimize embarrassment. (Jenison Public Schools District No. 30, Statement of Policy, pp. 1–2.)

the constitutionality of prayers and Bible reading in the public schools.

In the Engel case the court ruled that the recitation of a prayer composed by the New York State Board of Regents, at the direction of the local Board of Education, violated the establishment clause of the First Amendment.

In the Schempp case, the court held that a requirement that the school day open with a reading, without comment, of verses from the Holy Bible and the recitation of the Lord's Prayer by the students in unison, was also a violation of the establishment clause. This was so even though attendance at the exercises was not compulsory.

The establishment clause of the First Amendment has two important characteristics. First, the relationship between government and religion; by that relationship the First Amendment, by its position of neutrality, protects both religion and government. Secondly, the establishment limitation serves as an instrument to the second provision of the First Amendment, namely, the free exercise clause. It is designed in this respect to insure to all the free exercise of their religion, free from the influential interference of government.

Nothing in the Engel or Schempp decisions inhibits in the slightest way an individual in the free exercise of religion in his home, in his church, or in any assembly with the particular denomination to which he belongs, either in the practice or the teaching of that religion.

██ On the other hand, the First Amendment insures to parents the security that children attending public elementary schools are not officially taught the tenets of a religion other than that of the parents. This insurance is a protection to both the majority and the minority, and it is an essential safeguard to the protection and free exercise of religion. In the fast-changing circumstances of our day, today's majority may be tomorrow's minority.

The natural right of the parents to educate their children was recognized by Mr. Justice McReynolds in Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070.

"The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from the public teachers only. The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to prepare him for additional obligations." Id. at 535, 45 S.Ct. at 573.

██ When the time of the public grade schools is given over to religious practices, there is an interference with this fundamental right of parents to see to the education of their children, for continued observances, being repetitive, when joined with the authority of the local school, could easily constitute a teaching of the particular practices and beliefs involved.[2]

2. See: Prayer, Public Schools and the Supreme Court, Kauper, Michigan Law Review, April 1963, Vol. 61, Page 1031, at Page 1065:
"Viewed with respect to the precise problem before the Court, the decision in Engel is not a disturbing one, when evaluated in terms of underlying policy considerations. Prayer, religious faith, and the freedom of religion are not damaged by the Court's holding. On the contrary, the decision maintains the dignity and religious significance of prayer by keeping it free from state compulsion and interference, and, by the same token, it preserves the freedom of both the believer and the non-believer in respect to prayer. Nor should it be of consequence that the prayer was 'nonsectarian.' Even such a prayer can be productive of religious divisiveness, not only because it is objectionable to non-believers or non-theistic religionists, but also because theistic believers may find it an offense to conscience to engage in prayer except in accordance with the tenets of their own religion. Moreover, religionists can have little en-

■ By sending their children to the public schools, parents tacitly approve of the education which the children will receive there. However, when religion is included in the regular program in such a way as to become connected with the learning process, other than within the framework of a general, objective course on religion as religion, the parents have every right to object on constitutional grounds, for espousal of a particular religious doctrine is not the function of the public grade schools in our society.

■ Children attending public grade schools are effectively captives. Thus, in seeking an accommodation, school authorities, and those accommodated, must not violate the rights of free exercise of those not in accord with the practices of the accommodated.

■ Each individual in society has the right to free exercise of his religion according to the dictates of his own conscience. There is a corresponding duty upon public authority as well as other individuals to recognize and respect that right in such a way that the individual is free from coercion of any kind.[3]

Mr. Justice Clark, in the majority opinion in the Schempp case, succinctly stated the basis for the belief in separation of government from any one form of religion when he quoted from the Engel case, supra: " * * * the 'first and most immediate purpose (of the Establishment Clause) rested on the belief that a union of government and religion tends to destroy government and to degrade religion.' (Citation omitted.) When government, the Court said, allies itself with one particular form of religion, the inevitable result is that it incurs 'the

hatred, disrespect and even contempt of those who held contrary beliefs.' Ibid." (Abington School District v. Schempp, supra, 374 U.S. at 221, 83 S.Ct. at 1571.)

In Schempp, it was contended that to require the elimination of religious exercises in public schools was an interference with the religious liberty of those children who wished to participate. In this respect, Justice Clark said:

"Finally, we cannot accept that the concept of neutrality, which does not permit a State to require a religious exercise even with the consent of the majority affected, collides with the majority's right to free exercise of religion. While the Free Exercise Clause clearly prohibits the use of state action to deny the rights of free exercise to *anyone*, it has never meant that a majority could use the machinery of the State to practice its beliefs. Such a contention was effectively answered by Mr. Justice Jackson for the Court in West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628:

" 'The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to * * freedom of worship * * * and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.'

"The place of religion in our society is an exalted one, achieved

---

thusiasm for an officially sanctioned nonsectarian expression of religious belief which at most reflects a vague and generalized religiosity. Any usefulness of a prayer practice in public schools as symbolic of the religious tradition in our national life, of the values of religion to our society, and of religious ideas shares in common, must be weighed against the peril that the official promotion of common-denominator religious

practices, conspicuous by their vagueness and syncretistic character, will contribute to the furtherance and establishment of an official folk or culture religion which many competent observers regard as a serious threat to the vitality and distinctive witness of the historic faiths."

3. Brown, Observer in Rome, Appendix B, p. 261.

through along tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind. We have come to recognize through bitter experience, that it is not within the power of government to invade that citadel, whether its purpose or effect be to aid or oppose, to advance or retard. In the relationship between man and religion, the State is firmly committed to a position of neutrality. Though the application of that rule requires interpretation of a delicate sort, the rule itself is clearly and concisely stated in the words of the First Amendment." (Abington School District v. Schempp, supra, 374 U.S. at 225–226, 83 S.Ct. at 1573–1574.)

An examination of the establishment clause in light of the Schempp and Engel cases, supra, reveals that there need be no coercion upon minorities in order for a violation of the establishment clause to exist. *It is only necessary that the practice or enactment have the net effect of placing the official support of the local or national government behind a particular denomination or belief.* Abington School District v. Schempp, supra, 374 U.S. at 222, 83 S.Ct. 1560. See also Engel v. Vitale, supra, 370 U.S. at 430–436, 82 S.Ct. 1261.

Similarly, were state or federal government to espouse a particular philosophy of secularism, or secularism in general, the establishment clause would be violated. Zorach v. Clauson, 343 U.S. 306, 314, 72 S.Ct. 679, 96 L.Ed. 954, Abington School District v. Schempp, supra, 374 U.S. at 225, 83 S.Ct. 1560.

However, there do exist areas in which the interplay between government and religion does not constitute an establishment of religion. This is the field of accommodation, first expressed in the Zorach case, and explored at great length by Mr. Justice Brennan in a concurring opinion in Schempp. Abington School District v. Schempp, 374 U.S. 203, 230, 83 S.Ct. 1560, 10 L.Ed.2d 844, 862. It has also been noted in articles by leading commentators.[4]

As set forth in Zorach v. Clauson, supra, the principle was stated:

"When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs." Id. 343 U.S. at 314, 72 S.Ct. at 684, 96 L.Ed. at 962.

It may well be that this court will be called upon to decide ultimately whether or not the actual operation of a particular practice is a permissible form of accommodation. However, for the present, it seems clear that, in light of the decided cases, the public schools, as between theistic and humanistic religions, must carefully avoid any program of indoctrination in ultimate values.

The touchstone in both Engel and Vitale, supra, and Abington School District v. Schempp, supra, was the support given to the practices by the local school authorities. In both cases, the exercises were directed to be held at the opening of the school day. Students who chose not to participate were required to absent themselves at the start of the school period or remain and silently endure a ceremony which violated their constitutional rights.[5]

4. See, for example, Religion and the Public Order, pp. 17–23, (edited by Giannela, 1963); Prayer, Public Schools and the Supreme Court, Kauper, Michigan Law Review, April 1963, Vol. 61, Page 1031, at pp. 1066–1068.

5. See: Prayer, Public Schools and the Supreme Court, Kauper, Michigan Law Review, April 1963, Vol. 61, Page 1031, at page 1066:
"The issue raised in Engel is symptomatic of the problem we face in a religiously pluralistic society. * * *
"Religionists have ground for complaint if the public schools by studied indifference teach that belief in God is irrelevant

■ Now, it is this court's proposal that the students who wish to say a prayer or read scriptures according to their choice in the morning before the school day begins and after the school day ends, be permitted to do so; provided, however, that they meet in a room other than their regular home room, and complete their exercise at least five minutes before the regularly scheduled class day, or at least five minutes after the completion of the regular school class day.

Furthermore, no bell signifying the start of a prayer exercise should be rung. This exercise is voluntary, and those wishing to avail themselves of the opportunity provided should learn the time when it is offered to them and appear at the designated location without the aid of a school bell. The first bell should signal that school is about to begin.

This plan is an attempted accommodation, and since it is an accommodation, it must in no way affect those who do not wish an accommodation. For this reason, the practices which are observed must be free of any possible elements of coercion. Those who do take the opportunity to participate in the program must be separated from the official activity of the school, as of course must be the program itself. This is the reason for the directed time gap between the end of the practices and the official start of school, and between the end of the school day and the beginning of the practices after the close of the school day.

Furthermore, to fully insure that separation, this court will require that at the completion of the morning exercises there be a general commingling of the entire student body on the way to class.

to life. The Engel decision does not require such indifference. Consistent with it the schools may follow practices and teaching programs that help to create awareness, appreciation and understanding of the religious factor in the life of the nation and its citizens. They may create respect for the moral values which reflect the community consensus and which illuminate the purposes and processes of our democratic society. But it is not their responsibility or function to cultivate an official faith or ideology, whether religious or humanistic in character, or to indoctrinate students in any system of beliefs and values that rests on a claim of insight into ultimate truth with respect to the meaning and purpose of life. Parents who desire religious instruction for their children as part of a school program have the option of sending them to parochial schools. One effect of the school prayer decision is to highlight the importance of private schools and of the parents' freedom of choice in our free and pluralistic society that does not recognize governmental monopoly of the educational process. But the majority of Americans who are concerned with the relevancy of religious teaching to the total educational program do not see the parochial school as the answer to the problem. Their interest may lie in the further development of dismissed-or released-time programs in connection with the operation of the public school systems. Moreover, in view of the present impassse with respect to the parochial school situation, it may well be that the shared-time plan offers the grestest promise for reconciling the felt needs for religious instruction with the secular limitations placed on the public school systems. All proposals of this kind deserve careful study. Needless to say, any constructive solution to the problem will require a generous measure of sympathetic understanding, good will and tolerance on the part of all concerned elements of the community.

"Whatever the merits of plans for accommodating the educational system to programs of formal religious instruction, they should not serve to obscure the fundamental consideration that the cultivation of religious faith is the responsibility of home and church. If secularism triumphs as the dominant American ideology, it will not be because of the Constitution or the Supreme Court or because the public schools have failed in their limited tasks, but because meaningful and vital religious faith has lost its place in the hearts and lives of the people. The Engel decision is a forceful reminder to parents and the churches that theirs is the task and responsibility of making prayer, worship and religious instruction rich and meaningful in the lives of their children."

just as there would be were there no exercises whatsoever. That is, all rooms will be empty before the bell rings for the start of the school day. Thus, home rooms, or whatever room students use to commence the official school day will be filled in the usual way, and no student will enter a room containing a group which has previously congregated there for the purpose of prayer—all students will enter simultaneously upon the signal for the start of the school day.

For example, those children wishing to pray before school begins, and who would ordinarily begin the class day in home room A, might meet for prayer in home room B; and, in like manner, those students from home room B who desire to pray might meet in home room A. Thus, when the first bell sounded, all students would proceed to their regular classrooms.

If a prayer is to be said during the lunch period, it shall be a silent prayer, during a few moments of silence set aside for private meditation at the start of that period.

If any reading is to be done, let it be a selection from one of our historical documents, such as the Declaration of Independence, or the Northwest Ordinance; or, for example, speeches of our martyred Presidents, such as Lincoln's Gettysburg Address, or John F. Kennedy's inaugural address; or any one of the Thanksgiving proclamations of any President, or of any Governor.[6]

These writings would be lessons in the impact of religion upon the men who were leaders of our nation, and in turn, through them, upon the nation's affairs and history. The annals of our nation are replete with indications of the essentially religious character of this country [7]—belief in a Supreme Being,[8] belief that the rights of man are not the creation of government [9]—and the pro-

6. For an example of some of the past presidential speeches which would be acceptable for this purpose, see Footnote 3 to Mr. Justice Stewart's dissenting opinion in Engel v. Vitale, 370 U.S. 421, 446–448, 82 S.Ct. 1261, 8 L.Ed.2d, 601, 617–618.

7. See, for example, Abington School District v. Schempp, 374 U.S. 203, 213, 83 S.Ct. 1560, 1566, 10 L.Ed.2d 844, 853: "It can be truly said, therefore, that today, as in the beginning, our national life reflects a religious people * * *" See, likewise, President Lincoln's Inaugural Address of March 4, 1865: "* * * Fondly do we hope, fervently do we pray, that this mighty scourge of war may speedily pass away. Yet, if God wills that it continue until all the wealth piled by the bondsman's two hundred and fifty years of unrequited toil shall be sunk, and until every drop of blood drawn with the lash shall be paid by another drawn with the sword, as was said three thousand years ago, so still it must be said 'the judgments of the Lord are true and righteous altogether.' "With malice toward none, with charity for all, with firmness in the right as God gives us to see the right, let us strive on to finish the work we are in, to bind up the nation's wounds, to care for him who shall have borne the bat-

tle and for his widow and his orphan, to do all which may achieve and cherish a just and lasting peace among ourselves and with all nations." And from the Inaugural Address of President Kennedy, January 20, 1961: "With a good conscience our only sure reward, with history the final judge of our deeds, let us go forth to lead the land we love, asking His blessing and His help, but knowing that here on earth God's work must truly be our own."

8. "We are a religious people whose institutions presuppose a Supreme Being." Zorach v. Clauson, 343 U.S. 306, at 313, 72 S.Ct. 679, at 684, 96 L.Ed. 954, at 962. See also, Joint Congressional Resolution of July 30, 1956, 70 Stat. 732, declaring the national motto to be "In God We Trust."

9. See, for example, the Declaration of Independence: "When in the Course of human events it becomes necessary for one people to dissolve the political bands which have connected them with another, and to assume among the Powers of the earth, the separate and equal station to which the Laws of Nature and of Nature's God entitle them, a decent respect to the opinions of mankind requires that they should declare the causes which impel them to the separation.

nouncements of the Supreme Court of the United States demonstrate that the nation is not hostile, nor are any of its governmental units hostile to religion as such.[10]

Those children who may themselves dissent, or whose parents may dissent from their participating in the exercises, would be required only to report for school at the regular opening time of school and would be permitted to leave school at the regular closing time.

Certainly the period of silent prayer before lunch affords the students an opportunity to say their own denominational prayer, and all would be privileged to say any prayer which their own denomination may have taught them. Those who do not share the prayer would be free to contemplate anything which they desired.

■ During the regular school day, there will be no reading from the Bible, nor Bible stories, and no themes will be assigned on such topics as "Why I believe or disbelieve in religious devotions."

■ Additionally, the pledge of allegiance and patriotic songs or readings are permissible at any time, provided they are voluntary.

■ The role of the teacher at these pre- or post-school sessions is strictly that of one charged with the responsibility of maintaining order. No teacher shall be called upon to select the prayer which should be said, or to select the readings which may be given. The students would determine, by means of their own choosing, what should be done in this respect. The burden would not be cast upon the teacher to make the decision, nor to stand up and be counted.

This approach is by no means a final judgment of the court, nor should it be taken as a preliminary indication of a final judgment. In suggesting this plan,

---

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable rights, * * *."

See, also, the Inaugural Address of President Kennedy, January 20, 1961: "* * * the same revolutionary beliefs for which our forebears fought are still at issue around the globe— the belief that the rights of man come not from the generosity of the state but from the hand of God."

And, also, from the address of President Kennedy delivered in Dallas, Texas, November 22, 1963: "We in this country, in this generation, are, by destiny rather than choice, the watchmen on the walls of world freedom. We ask, therefore, that we may be worthy of our power and responsibility, that we may exercise our strength with wisdom and restraint, and that we may achieve in our time and for all time the ancient vision of 'peace on earth, good will toward men.' That must always be our goal—and the righteousness of our cause must always underlie our strength. For as was written long ago: 'Except the Lord keep the city, the watchman waketh but in vain.'"

10. "But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence." Zorach v. Clauson, supra, 343 U.S. at 314, 72 S.Ct. at 684.

"It has been argued that to apply the Constitution in such a way as to prohibit state laws respecting an establishment of religious services in public schools is to indicate a hostility toward religion or toward prayer. Nothing, of course, could be more wrong. The history of man is inseparable from the history of religion." Engel v. Vitale, supra, 370 U.S. at 433–434, 82 S.Ct. at 1268.

"We agree of course that the State may not establish a 'religion of secularism' in the sense of affirmatively opposing or showing hostility to religion, thus 'preferring those who believe in no religion over those who do believe.'

* * * * *

"Nothing we have said here indicates that such study of the Bible or of religion, when presented objectively as part of a secular program of education, may not be effected consistently with the First Amendment." Abington School District v. Schempp, supra, 374 U.S. at 225, 83 S.Ct. at 1573.

"The place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home the church and the inviolable citadel of the individual heart and mind." Id. at 226, 83 S.Ct. at 1574.

the court is merely trying to arrive at an interim accommodation, having foremost in mind the natural, God-given rights of each parent to determine the course of religious education for his child, but also considering the fact that the present proposal of the school board does relate to a serious effort to reconcile divergent opinions in an area where rigid, dogmatic positions too often abound, with the effect that a problem of continuing importance results in increased misunderstanding and bitterness, a situation which must certainly be regretted by all, regardless of religious affiliation, or lack of it.

The Engel and Schempp cases, supra, were decided on the basis of the establishment clause of the First Amendment. The accommodation suggested in this opinion is an attempt to avoid the nexus between official authority and religion which constitutes a violation of the establishment clause.

However, even should the program successfully escape the prohibitions of the Establishment Clause, as administered it may possibly result in abridgment of rights of free exercise, and for this reason testimony may be required to determine precisely the effect which such a program has.[11]

11. "Neither the fact that the prayer may be denominationally neutral nor the fact that its observance on the part of the students is voluntary can serve to free it from the limitations of the Establishment Clause, as it might from the Free Exercise Clause. * * *" Engel v. Vitale, 370 U.S. 421, at 430, 82 S.Ct. 1261, at 1266, 8 L.Ed.2d 601. "Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion." Abington School District v. Schempp, 374 U.S. 203, at 223, 83 S.Ct. 1560, 10 L.Ed.2d 844.

12. For a lucid comment on the problem generally, see Ramsey, "Teaching 'Virtue' in the Public Schools"—Religion and the Public Order, pp. 37–8 (edited by Giannela, 1963).
"Voluntary or prescribed readings may be edifying without being devotional and no less educational than instruction about the history of religion.

I direct that provision be made for the keeping of a record of the happenings during this interim period, as an aid to the court in reaching a final judgment on the merits in this case.

There is available a vast store of examples of our national leaders lifting up their minds and hearts for worship, guidance, supplication, and thanksgiving, —all of which would be permissible. But a program incorporating such examples into the school day does require conscientious effort on the part of teachers and students. It will have its own reward, in enhancing a knowledge of our history, informing sound moral tenets, and providing a true regard for man's individual relationship to God.[12]

In this sensitive area of constitutional law, our jurisprudence must be prudential. If there be a solution, it may be found only at the end of a period of patient trial, success, error experience. Ultimate results may be worth the irenic effort.

I am not granting the injunction requested in this case. I am setting forth this policy during the pendency of this suit, and I expect it will be followed. If it is not followed, I will then consider the granting of an injunction.

\*     \*     \*     \*     \*

"From Plato and Aristotle to our own time, one question that may never have been answered conclusively is: Can virtue be taught? Our achievement is no longer to ask the question, but to proceed upon the unexamined assumption that the way to teach virtue is to inform and discipline what we mistakenly called the 'intellect.'
"In response to the Court's prayer and Bible-reading decision, should there not be numerous and radically new experiments in public education on how to teach anybody to become someone? It is incidental that in the course of this the pupils might glimpse for the first time the meaning in the fact that one who has borne the human countenance became someone by first becoming and being religious. They might learn, in an entirely free, unimposed, and unembarrassing way, what religion is all about. Then the public schools could remain entirely secular, without secularizing."