**Jeanne BRANDON et al., Appellants,**

v.

**The BOARD OF EDUCATION OF the GUILDERLAND CENTRAL SCHOOL DISTRICT et al., Appellees.**

**No. 291, Docket 80–7382.**

United States Court of Appeals, Second Circuit.

Argued Oct. 28, 1980.

Decided Nov. 17, 1980.

Robert M. Andersen, Chicago, Ill. (Robert P. Roche, Albany, N. Y., David M. Fleming, Catholic League for Religious and Civil Rights, Milwaukee, Wis., of counsel), for appellants.

C. Theodore Carlson, Tabner, Carlson, Daffner & Farrell, Albany, N. Y., for appellees.

Leo Pfeffer, New York City, as amicus curiae for the American Jewish Congress, American Jewish Committee, Anti–Defamation League of B'nai B'rith, Central Conference of American Rabbis, Jewish Labor Committee, Jewish War Veterans of the U.S.A., Rabbinical Assembly, Rabbinical Council of America, Union of American Hebrew Congregations, United Synagogue of America, The National Jewish Community Relations Advisory Council in behalf of the one hundred and eight Jewish Community Councils throughout the United States.

Before   KAUFMAN,   KEARSE   and BRIGHT,* Circuit Judges.

---

* Of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

IRVING R. KAUFMAN, Circuit Judge:

To many Americans, the state's noblest function is the education of our nation's youth. We entrust this responsibility largely to the public schools, and hope our children grow into responsible citizens by learning the enduring values of Western Civilization we all share–an appreciation of critical reasoning, a commitment to democratic institutions, and a dedication to principles of fairness. In this immigrant nation of dreamers and dissidents, however, no broad consensus regarding the spiritual side of the human condition exists. Our Founding Fathers recognized the disharmony and drafted the Bill of Rights to require the separation of church and state. Accordingly, religious activity under the aegis of the government is strongly discouraged, and in some circumstances–for example, the classroom–is barred. The sacred practices of religious instruction and prayer, the Framers foresaw, are best left to private institutions–the family and houses of worship. In short, logic, tradition, and law create in our nation a "wall between church and state," *Everson v. Board of Education*, 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947). In this case, brought by students seeking to force a public school to allow joint prayer sessions in the school before classes begin, we are asked to dismantle that wall. Because the First Amendment does not require–or even allow–such permission, we affirm the dismissal below of the students' complaint.

## I.

Questions of religious freedom can depend on sensitive issues of fact, and we turn first to the particular circumstances in which this case arose. In 1978, several students at Guilderland High School organized a group called "Students for Voluntary Prayer." They sought permission in September 1978 from the school's principal, Charles Ciaccio, to conduct communal prayer meetings in a classroom immediately before the school day commenced. The group noted that it was not seeking supervision or faculty involvement, and stated that its activities were voluntary and would not conflict with other school functions.

The principal denied the request by letter dated September 23, 1978. Shortly thereafter, the Superintendent of the Guilderland School District refused permission. The Guilderland Board of Education voted on December 19, 1978, and again on March 6, 1979, to deny the group's request. Six students [1] filed suit in June 1979 individually and on behalf of those students similarly situated. They stated in the complaint that the defendants–the Board of Education and its individual members, the Superintendent of the school district, and Ciaccio, the principal–violated their First and Fourteenth Amendment rights to the free exercise of religion, freedom of speech, freedom of association, and equal protection. The students sought declaratory relief and requested the court to enjoin the defendants from denying them a classroom for their prayer meetings. The complaint prayed for monetary damages as well.

On April 16, 1980, Judge McCurn granted summary judgment for the defendants, holding that the students were not entitled to relief as a matter of law and dismissing the complaint. After addressing several procedural points,[2] the court found that the

---

1. Three of the six plaintiffs–Jeanne Brandon, Jill George, and William Smith–were minors when the action was commenced and were represented by their parents or legal guardians. All of the plaintiffs have since graduated from Guilderland High School. No mootness problem exists, however, *DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), because the students were acting in a representational capacity for members of the "Students for Voluntary Prayer." *See Trachtman v. Anker*, 563 F.2d 512, 514 n.1 (2d Cir. 1977), *cert.*

denied, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978). Moreover, their claim for monetary damages remains extant.

2. Judge McCurn correctly held that the plaintiffs' failure to present a written verified complaint to the school officials within three months after the accrual of their claim, required by New York Educ. Law § 3813(1) (McKinney) as a condition precedent to the commencement of non–tort suits against a school district, did not necessitate dismissal of the complaint. He found that compliance with

Establishment Clause of the First Amendment barred the school from permitting the students to conduct prayer meetings in a classroom. Applying the tripartite test for Establishment Clause analysis formulated by the Supreme Court, *Committee for Public Education & Religious Liberty v. Regan*, 444 U.S. 646, 653, 100 S.Ct. 840, 846, 63 L.Ed.2d 94 (1980); *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105 (1971), Judge McCurn found that while a school's decision involving the use of school premises might have a secular purpose, the granting of the group's request would have had the impermissible effect of advancing religion. In addition, if the prayer meetings were conducted, an excessive entanglement between a supposedly secular school and clearly religious activities would result because faculty surveillance would be needed to assure that the meetings were voluntary.

Further Judge McCurn found the school's refusal did not violate the students' rights freely to exercise their religious beliefs. Moreover, even if some infringement occurred, the compelling state interest in maintaining the separation between church and state justified that restriction. Judge McCurn also rejected the students' freedom of speech and association arguments. Finally, the court found that the Equal Protection Clause of the Fourteenth Amendment did not require a religious organization to be treated in a manner similar to the secular student groups permitted to use the school's facilities. The students appeal the dismissal of their complaint.

## II.

The First Amendment's language protecting religious freedom is both crisp and elegant: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." While the ambiguities of history prevent us from determining exactly how the Founding Fathers intended the Establishment and Free Exercise Clauses to interact, coherent themes exist. The Supreme Court's identification and elaboration of doctrine provides guidance to legislators, courts, and even school boards, in an era when the government's regulation of daily life is pervasive and when our nation's religious composition is far more diverse than that of post-Revolutionary America.

First Amendment jurisprudence emerges from a colonial background that reflected varying justifications for the separation of church and state.[3] An evangelical view, associated with Roger Williams, feared the corruptive influence of secular statism on religious purity. Religious freedom and separatism, therefore, were necessary for the protection of the spiritual life. A more worldly school of thought, associated with Jefferson, sought to protect the state from the church, and found that the erection of a "wall of separation," *Everson, supra*, was necessary. The third view, that of James Madison, was that both religion and the state would prosper if freed from the undesirable effects each presented to the other.

The Supreme Court has consolidated these historical antecedents[4] to articulate three major policies underlying religious freedom: voluntarism of religious thought and conduct, government neutrality towards religion, and the separation of church and state.[5] Voluntarism recognizes that

the notice requirement is not mandatory in civil rights actions brought pursuant to 42 U.S.C. § 1983. *See Paschall v. Mayone*, 454 F.Supp. 1289, 1298 (S.D.N.Y.1978); *Glover v. City of New York*, 401 F.Supp. 632, 635 (E.D.N.Y. 1975); *Carrasco v. Klein*, 381 F.Supp. 782, 787 n.12 (E.D.N.Y.1974); *Laverne v. Corning*, 316 F.Supp. 629, 637 (S.D.N.Y.1970).

**3.** See L. Tribe, *American Constitutional Law* § 14–3 at 816–17 (1978).

**4.** *See, e. g., Walz v. Tax Commission*, 397 U.S. 664, 667–72, 90 S.Ct. 1409, 1410–1413, 25

L.Ed.2d 697 (1970); *School District of Abington Township v. Schempp*, 374 U.S. 203, 230–42, 83 S.Ct. 1560, 1575, 1582, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring); *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

**5.** Tribe, *supra*, § 14–4 at 818–19; Note, *Government Neutrality and Separation of Church and State: Tuition Tax Credits*, 92 Harv.L.Rev. 696, 697–700 (1979).

private choice, not official coercion, should form the basis for religious conduct and belief. *Walz v. Tax Commission*, 397 U.S. 664, 694, 90 S.Ct. 1409, 1424, 25 L.Ed.2d 697 (1970) (Harlan, J., concurring). Governmental neutrality reinforces voluntarism, for it assures its citizens, on the one hand, that no official imprimatur lies behind any set of religious beliefs or practices and, on the other, that no particular dogma is officially condemned. *School District of Abington Township v. Schempp*, 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844 (1963); *Engel v. Vitale*, 370 U.S. 421, 431, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962). Separation is meant to foster voluntarism and neutrality, and also to preserve the integrity of both religion and government. *See Engel v. Vitale, supra*, 370 U.S. at 431, 82 S.Ct. at 1267.

As the role of government became more pervasive, a tension between principles of voluntarism and separation inevitably emerged. A strict reading of the Establishment Clause's erection of the wall between church and state would require government to refrain from providing even the most essential public services to religious organizations. Such inflexible separation, however, threatens free exercise, and therefore the principle of neutrality requires the state to provide fire and police services—and even some forms of financial assistance—to religious schools and organizations. *Roemer v. Board of Public Works*, 426 U.S. 736, 746–47, 96 S.Ct. 2337, 2344–2345, 49 L.Ed.2d 179 (1976).[6] Accommodation of these three constitutional values is a trying task, but one in which courts are compelled to engage.

### III.

When we apply these doctrines–voluntarism, neutrality, and separation–to the facts of this case, we discover that many of the Supreme Court's religion decisions arose in a somewhat different context. Most controversies involving prayer in the schools or the granting of financial assistance to religious schools involved an Establishment Clause challenge to state statutes or regulations [7] *supporting* religious activity–the recitation of classroom prayers, *School District of Abington Township v. Schempp, supra*, the use of school facilities for religious instruction, *McCollum v. Board of Education*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), and the reimbursement for costs incurred in teaching–related activities, *e. g., Regan, supra; Lemon v. Kurtzman, supra.* These cases present the question whether the particular state action encouraging religious activity demonstrates an impermissible support of religion and an infringement of the free exercise rights of others who fail to receive similar state support.

This case raises a different problem. The local school board, acting as a duly authorized agent of New York state, New York Educ. Law § 414 (McKinney); *Trietley v. Board of Education*, 65 A.D.2d 1, 5, 409 N.Y.S.2d 912, 915 (1978), *refused* to sponsor religious activity in public schools. The suit was brought by advocates of religious activity, who seek to compel the granting of permission. Our focus, therefore, is to determine whether the school's refusal violated the Free Exercise rights of the "Students for Voluntary Prayer," and exhibited a degree of hostility towards a particular religious organization sufficient to transgress the principle of government neutrality, thereby violating the Free Exercise

6. *See, e. g., Committee for Public Education & Religious Liberty v. Regan*, 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980) (reimbursement to religious schools for costs in administering statewide standardized tests); *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (textbook loan program to students of private schools); *Everson v. Board of Education, supra* (reimbursement to parents of parochial school students for public transportation costs).

7. The religious freedoms protected by the First Amendment are incorporated in the Fourteenth Amendment, and therefore limit the conduct of state governments as well as the federal government. *Regan, supra*, 444 U.S. at 649 n.1, 100 S.Ct. at 844 n.1 (1980); *Everson, supra* 330 U.S. at 15, 67 S.Ct. at 511 (incorporating Establishment Clause); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (incorporating Free Exercise Clause).

Clause. Once we examine the implications of the School Board's refusal, we will turn to the Establishment Clause problems that would have arisen had the School Board authorized the holding of voluntary prayer meetings prior to the commencement of the school day.

### A.

■■■ To demonstrate an infringement of his free exercise rights, an individual must show "the coercive effect of the [state] enactment as it operates against him in the practice of his religion." *School District of Abington Township v. Schempp, supra*, 374 U.S. at 223, 83 S.Ct. at 1572. The analysis need not involve a court in determining the sincerity of one's religious beliefs, *United States v. Ballard*, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), but it does require that the court inquire into the relative importance of a particular religious ritual and the degree to which exercise of that practice is infringed by government action. *See, e. g., Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). *See also* Giannella, *Religious Liberty, Nonestablishment, and Doctrinal Development: Part 1. The Religious Liberty Guarantee*, 80 Harv. L.Rev. 1381, 1390–1423 (1967). A limitation on religious exercise is justified only if the state can demonstrate that its compelling interest in public health, welfare, morality, or other secular values justifies the restriction, and that less restrictive means to achieve the state's secular ends are not available. *See Sherbert v. Verner, supra*, 374 U.S. at 406, 83 S.Ct. at 1795; *see also* L. Tribe, *American Constitutional Law* § 14–

10 (1978). Reconciliation of these conflicting individual and state interests is accomplished only through an arduous balancing effort, one in which courts reluctantly engage.

In *Wisconsin v. Yoder, supra*, the Supreme Court found the criminal sanctions contained in a state compulsory education statute requiring attendance through age sixteen to violate the free exercise rights of Amish parents and their children. The Amish faith, the Court found, requires its members to lead a simple life, and to minimize contact with world influences by discontinuing formal schooling after the eighth grade. Chief Justice Burger, writing for the Court, found the practice "fundamental" and "mandated by the Amish religion." 406 U.S. at 216, 217, 92 S.Ct. at 1533–1534. The state's interest in the education of its citizens, admittedly significant, was therefore not sufficiently compelling to force the Amish to send their children to school beyond the eighth grade.

Similarly, in *Sherbert v. Verner, supra*, the Court found the observance of the Sabbath to be a "cardinal principle" for Seventh Day Adventists, 374 U.S. at 406, 83 S.Ct. at 1795. While the state's goal of preventing the raising of spurious unemployment claims and the subsequent dilution of state assistance funds was important, it did not justify forcing a Seventh Day Adventist to choose between following fundamental religious beliefs and eschewing benefits to which she was otherwise entitled. The state's failure to show that less restrictive practices would not have furthered its interest in preventing fraudulent claims supported the finding of a free exercise violation.[8]

---

**8.** In several additional landmark free exercise cases the individual religious interests of Jehovah's Witnesses in peddling their religious literature, *e. g., Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), and of members of the American Native Church in using peyote for religious ceremonies, *People v. Woody*, 61 Cal.2d 716, 394 P.2d 813, 40 Cal. Rptr. 69 (1964), outweighed state interests advanced for the regulation of those activities through licensing and the imposition of criminal sanctions, respectively. But the public in-

terest in the health and well–being of minors justified a statutory ban on the public sale of religious periodicals by minor members of the Jehovah's Witnesses, *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). The desirability of creating a uniform day of rest was accepted by the Supreme Court in *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961), which held that an Orthodox Jewish merchant had no right to an exemption to Pennsylvania's Sunday closing law. For a discussion of how *Braunfeld* has

## B.

We find that the free exercise rights of the "Students for Voluntary Prayer" were not limited by the Guilderland School District's refusal to permit communal prayer meetings to occur on school premises. The students assert in their complaint that "God has directed them to join together with one another and pray to him as a group whenever possible and that such communal prayer is particularly rewarding and effective...." We do not challenge the students' claim that group prayer is essential to their religious beliefs. The effect of the school's actions, however—denying the students the opportunity to pray together in a classroom at the commencement of a school day—is hardly analogous to the coercive restraints on religious observation imposed by state action in *Sherbert* or *Yoder*.

The dilemma presented to individuals in *Sherbert* and *Yoder* was absolute. Individuals were forced to choose between neglecting their religious obligations and rendering themselves liable for criminal sanctions or ineligible for state benefits. The choice for the students in this case is much less difficult because the school's rule does not place an absolute ban on communal prayer, nor are sanctions faced or benefits forfeited. While school attendance is compelled for several hours per day, five days per week, the students, presumably living at home, are free to worship together as they please before and after the school day and on weekends in a church or any other suitable place. *Stein v. Oshinksy*, 348 F.2d 999, 1001 (2d Cir.), *cert. denied*, 382 U.S. 957, 86 S.Ct. 435, 15 L.Ed.2d 361 (1965), *citing School District of Abington Township v. Schempp*, *supra*, 374 U.S. at 299, 83 S.Ct. at 1612 (Brennan, J., concurring). Several courts have noted that denial of the use of school facilities to students who wish to conduct voluntary prayer meetings during the school day does not violate the Free Exer-

cise Clause. *Hunt v. Board of Education*, 321 F.Supp. 1263 (S.D.W.Va.1971); *Trietley v. Board of Education, supra; Johnson v. Huntington Beach Union High School District*, 68 Cal.App.3d 1, 137 Cal.Rptr. 43 (Ct. App.), *cert. denied*, 434 U.S. 877, 98 S.Ct. 228, 54 L.Ed.2d 156 (1977). *Contra, Reed v. Van Hoven*, 237 F.Supp. 48 (W.D.Mich. 1965). We do not have before us the case of a Moslem who must prostrate himself five times daily in the direction of Mecca, or children whose beliefs require prayer before lunch, sports or other school activities. *Stein v. Oshinsky, supra*, 348 F.2d at 1001–02. If faced with these religious demands from students, a school board might have to make additional accommodations to permit the students to withdraw momentarily from the class. *See Zorach v. Clauson*, 343 U.S. 306, 313–14, 72 S.Ct. 679, 683–684, 96 L.Ed. 954 (1952). We have not been convinced, however, that the religious needs of the "Students for Voluntary Prayer" require such accommodation.

Several cases have noted that the free exercise rationale set forth above does require the state to permit prayer in certain special circumstances. But, none of them is applicable here. Authorization for prayer at public universities, for example, has been required because students both study and reside there. Frequently they are unable to hold prayer meetings off campus. *Chess v. Widmar*, 635 F.2d 1310 (8th Cir. 1980), *petition for cert. filed*, No. 80–689, 49 U.S. L.W. 3353 (1980); *Keegan v. University of Delaware*, 349 A.2d 14 (Del.1975), *cert. denied*, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976). Similarly, because the isolated member of the armed forces or the prison inmate may have no access to the regular religious facilities of the community, free exercise freedoms would be jeopardized if religious activity on a military base or in a prison were not authorized. *School District of Abington Township v. Schempp, supra*,

survived the Supreme Court's decision in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), see Giannella, *Religious Liberty, Nonestablishment and Doctrinal Development: Part I. The Religious Liberty Guarantee*, 80 Harv.L.Rev. 1381, 1400–03

(1967). Finally, the state's interest in maintaining public morality, difficult at best to define clearly, served as the basis for refusing to grant the Mormons an exemption from federal laws prohibiting bigamy. *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878).

374 U.S. at 296–99, 83 S.Ct. at 1610–1612 (Brennan, J., concurring). Here, however, the students have made no showing that they lack other facilities for communal prayer.

### C.

Even if we were to accept the students' contention that the School Board's refusal to allow school prayer significantly encumbered their free exercise rights, a "compelling state interest" against the prayer meetings was present. *Sherbert v. Verner, supra.* The School board asserted as an affirmative defense below, and argues as a compelling state interest here, that an authorization of student–initiated voluntary prayer would have violated the Establishment Clause by creating an unconstitutional link between church and state. We agree.

■ A state statute or regulation does not contravene the Establishment Clause if (1) the enactment has a secular purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) it does not foster an excessive entanglement with religion. *Regan, supra,* 444 U.S. at 653, 100 S.Ct. at 846; *Lemon v. Kurtzman, supra,* 403 U.S. at 612–13, 91 S.Ct. at 2111.

A neutral policy granting all student groups, including religious organizations, access to school facilities reflects a secular, and clearly permissible purpose—the encouragement of extracurricular activities. *Chess v. Widmar, supra,* 635 F.2d at 1317; *Johnson v. Huntington Beach Union High School District, supra.* The second, or "effects," test is more difficult to apply, for its standards are uncertain; determination of the "principal" or "primary" effects of a state action, *Regan, supra,* or even the supposedly more refined "direct and immediate effect" standard, *Committee for Public Education & Religious Liberty v. Nyquist,* 413 U.S. 756, 783 n.39, 93 S.Ct. 2955, 2971 (1973), is, as one commentator notes, a "metaphysical distinction." Tribe, *supra,* § 14–9 at 840. The underlying question, however, is relatively straightforward: does a particular policy which is neutrally applied to religious organizations merely accommodate religious interests, or does it advance those nonsecular interests impermissibly?

Our nation's elementary and secondary schools play a unique role in transmitting basic and fundamental values to our youth. To an impressionable student, even the mere appearance of secular involvement in religious activities might indicate that the state has placed its imprimatur on a particular religious creed. This symbolic inference is too dangerous to permit. *See Roemer v. Board of Public Works, supra,* 426 U.S. at 750, 764, 96 S.Ct. at 2346, 2353 (1976); *Abington, supra; Engel, supra; Chess v. Widmar, supra,* 635 F.2d 1310; Tribe, *supra* § 14–5 at 825. An adolescent may perceive "voluntary" school prayer in a different light if he were to see the captain of the school's football team, the student body president, or the leading actress in a dramatic production participating in communal prayer meetings in the "captive audience" setting of a school. *O'Hair v. Andrus,* 613 F.2d 931, 936 (D.C.Cir.1979) (Leventhal, J.). Misconceptions over the appropriate roles of church and state learned during one's school years may never be corrected. As Alexander Pope noted, "Tis Education forms the common mind,/Just as the twig is bent, the tree's inclin'd." (Epistle to Lord Cobham).

*Abington* and *Engel,* for example, involved teacher supervision of the reading of verses from the Bible land the recital of a prayer composed by the State Board of Regents. Although students were permitted to be excused from the classroom during the prayer, the Supreme Court found that a particular form of Western theistic religion was improperly advanced by it. Similarly, when teachers from religious organizations are permitted to enter a public school for the purpose of religious instruction, the symbolism is apparent. *McCollum, supra.* Religious interests are permissibly accommodated, and not advanced, however, where a public school allows its students to leave the premises for religious instruction under a "released time" program. *Zorach, supra.* Further, the semblance of official

support is less evident where a school building is used at night as a temporary facility by religious organizations, under a program that grants access to all charitable groups. *Resnick v. East Brunswick Township Board of Education*, 77 N.J. 88, 389 A.2d 944 (1978). Also, where a clergyman briefly appears at a yearly high school graduation ceremony, no image of official state approval is created. *Wood v. Mt. Lebanon Township School District*, 342 F.Supp. 1293 (W.D. Pa.1972).

The degree of official support of religious activities is greater, of course, in the school prayer or religious instruction cases than in the instant case. The record indicates that school buses discharge students at the Guilderland High School between 7:20 a. m. and 7:40 a. m., and that the official school day "begins" at this point. Any voluntary student prayer meetings conducted after the arrival of the school buses and before the formal "homeroom" period at 7:50 a.m., therefore, would occur during school hours. The prayer meetings would create an improper appearance of official support, and the prohibition against impermissibly advancing religion would be violated.

The final element of the test is the prohibition of "entanglement," and the School Board has demonstrated that an excessive involvement of the state in religious matters would have resulted if the students' requests were granted. Entanglement analysis focuses on procedural questions. *Roemer v. Board of Public Works, supra*, 426 U.S. at 755, 96 S.Ct. at 2349, and, if the state must engage in continuing administrative supervision of nonsecular activity, church and state are excessively intertwined. This frequently occurs where categorical grants to private schools are distributed, since constant surveillance by the state is necessary to guarantee that no funds are used for religious purposes. *See, e. g., Nyquist, supra; Lemon, supra.* Excessive entanglement is undesirable because it involves state scrutiny of religious activities, a task necessarily requiring oversight of "core matters of belief and ritual." Tribe, *supra* § 14–12 at 870. This involvement threatens the voluntarism of religious observance and violates the principle of separation.

School officials in this case would be forced to monitor the activities of the "Students for Voluntary Prayer." The School Board has a duty under New York law to provide adequate supervision of all students in its "care and charge" during school hours. *Lauricella v. Board of Education*, 52 A.D.2d 710, 711, 381 N.Y.S.2d 566, 568 (4th Dep't 1976). Since the voluntary prayer meetings, to be conducted after the arrival of school buses, would, as we have said, occur during school hours, official supervision is required by law to ensure the smooth functioning of the school's secular schedule and the maintenance of the school's safety and order. More importantly, surveillance will be required to guarantee that participation in the prayer meetings would always remain voluntary.[9]

Finally, we note that the state's compelling Establishment Clause interest in removing from the school any indication of sponsoring religious activity leads to the inescapable conclusion that no alternative accommodations were possible. *See, e. g., Engel v. Vitale, supra.*

### IV.

■ This leaves for our disposition the students' claim that the School Board's refusal violates their rights to free speech,

---

**9.** In *Reed v. Van Hoven*, 237 F.Supp. 48 (W.D. Mich.1965), the court authorized a school to permit student–initiated voluntary prayer at the commencement of the school day. Teacher supervision was permitted to maintain order at the prayer sessions. The court suggested that no bell signifying the start of the prayer exercise would be rung and that there should be a general commingling of the entire student body on the way to class.

While the outcome of the case was questionable even in 1965, the Supreme Court's adoption of the entanglement test in 1969, *Walz v. Tax Commission, supra*, 397 U.S. at 674, 90 S.Ct. at 1414, seriously undercuts the holding. The faculty supervision authorized by the court's decision is indicative of continuing surveillance of the students' prayer sessions that would have been necessary to assure that no coercion resulted.

freedom of association, and equal protection. The students' argument, in short, is that they merely seek to exercise their rights to free speech in a public forum, unencumbered by governmental regulation of the context of their "speech." They state that, in general students retain their fundamental constitutional right to free speech while attending school, *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969), and that restraints on religious speech in a public forum are impermissible. *Fowler v. Rhode Island*, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953). Moreover, they argue that the School Board's denial of their request, in light of the ability of other student organizations to use school facilities, infringes their Fourteenth Amendment right to equal protection.

Two significant factors, however, defeat the claims. First, a high school is not a "public forum" where religious views can be freely aired. The expression of religious points of view, and even the performance of religious rituals, is permissible in parks and streets when subject to reasonable time, place, and manner regulations. *Niemotko v. Maryland*, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); *Kunz v. New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); *O'Hair v. Andrus, supra.* The facilities of a university have also been identified as a "public forum," where religious speech and association cannot be prohibited. *Chess v. Widmar, supra*, 635 F.2d 1310; *Keegan v. University of Delaware, supra.* A high school classroom, however, is different, *Chess v. Widmar, supra*, slip op. at 22–23. While students have First Amendment rights to political speech in public schools. *Tinker, supra*, sensitive Establishment Clause considerations limit their right to air religious doctrines. Equally compelling, the students in this case propose to conduct *prayer* meetings in the high school, not merely discussions about religious matters. When the explicit Establishment Clause proscription against prayer in the public schools is considered, *School District of Abington Township v. Schempp, supra;*

*Engel, supra*, the protections of political and religious speech, *Police Department of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Saia v. New York*, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948), are inapposite. *See Chess v. Widmar, supra* (Bright and McMillian, JJ., dissenting from denial of rehearing en banc). In short, these two vital distinctions indicate that the students' free speech and associational rights, cognizable in a "public forum," are severely circumscribed by the Establishment Clause in the public school setting. Because of the symbolic effect that prayer in the schools would produce, we find that Establishment Clause considerations must prevail in this context.

Also, the students' equal protection argument is not persuasive. Other organizations are permitted to utilize school facilities, but their use does not raise serious problems of the establishment of religion. Moreover, since all religious groups are equally denied access to school facilities, any equal protection argument lacks merit. *See Trietley, supra*, 409 N.Y.S.2d at 917.

V.

Although we affirm the dismissal of the students' complaint, we cannot be critical of their objectives. Introspective activity that seeks to strengthen the moral fibre of our nation's young adults deserves our support, but only in our role as private citizens. We hope that the "Students for Voluntary Prayer" can conduct their prayer meetings and religious discussions at another place and at different times. To permit these activities to occur in the classrooms of a public high school immediately prior to the commencement of the school day, however, would contribute to the erosion of principles articulated by our colonial fathers and embraced by religious dissenters for several hundred years. To paraphrase Lord Melbourne, while the state cannot be regarded as a pillar of the edifice of religion, it may be considered a buttress, supporting free exercise from the outside. We must be careful that our public schools, where fundamental values are imparted to our chil-

dren, are not perceived as institutions that encourage the adoption of any sect or religious ideology.