Joann BELL and Lucille McCord, Plaintiffs-Appellees-Cross-Appellants,

v.

The LITTLE AXE INDEPENDENT SCHOOL DISTRICT NO. 70 OF CLEVELAND COUNTY; the Board of Education of the Little Axe Independent School District No. 70 of Cleveland County, Elizabeth Butts, Henry Johnson, Charles Littlejim, Bill Scott, individually and as members of the Board of Education of Little Axe Independent School District No. 70 of Cleveland County; and Michael Luther, as a member of the Board of Education of Little Axe Independent School District No. 70 of Cleveland County; and Charles D. Holleyman, individually and as former superintendent of Little Axe Independent School District No. 70 of Cleveland County; and Paul Pettigrew, individually and as superintendent of Little Axe Independent School District No. 70 of Cleveland County; and Larry Garner, individually and as former elementary principal of Little Axe Independent School District No. 70 of Cleveland County; and Randall Prestgrove, individually and as elementary principal of Little Axe Independent School District No. 70 of Cleveland County, Defendants-Appellants-Cross-Appellees.

Nos. 83–1458, 83–1493.

United States Court of Appeals, Tenth Circuit.

June 26, 1985.

---

Barrett, Circuit Judge, filed opinion dissenting in part.

Micheal Salem of Rawdon and Salem, Norman, Okl., for the American Civil Liberties Union of Oklahoma for plaintiffs-appellees-cross-appellants.

Ruti G. Teitel, Anti-Defamation League of B'nai B'rith, New York City (Justin J.

Finger and Jeffrey P. Sinensky, Anti-Defamation League of B'nai B'rith, New York City, and Marc D. Stern, American Jewish Congress, New York City, of counsel), as amici curiae for plaintiffs-appellees-cross-appellants.

William D. Graves, Oklahoma City, Okl., for defendants-appellants-cross-appellees.

Lee Boothby, Attorney for Americans United for Separation of Church and State, Berrien Springs, Miss. (Robert W. Nixon, Washington, D.C., of counsel), filed an amicus brief for plaintiffs-appellees-cross-appellants.

Charles E. Rice of Notre Dame Law School, Notre Dame, Ind., filed an amicus brief for defendants-appellants-cross-appellees.

Samuel E. Ericsson and Kimberlee W. Colby, Attorneys for the Center for Law & Religious Freedom of the Christian Legal Society, Springfield, Va., filed an amicus brief for defendants-appellants-cross-appellees.

Before HOLLOWAY, Chief Judge, and BARRETT and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Plaintiff parents Joann Bell and Lucille McCord sued the Little Axe Independent School District,[1] the school board and its individual members, and several administrative officials (the District) under 42 U.S.C. § 1983 (1982), claiming that various District policies and practices violated the Establishment Clause of the First Amendment. In their initial complaint, Bell and McCord sought injunctive relief against the District for permitting religious meetings to be held on school premises during school hours and for permitting the distribution of Bibles at the school. They also sought a declaration that the Oklahoma voluntary prayer statute, Okla.Stat. tit. 70, § 11–101.1 (1981), was unconstitutional. When the District subsequently adopted an equal access policy, in part as a response to this

lawsuit, Bell and McCord amended their complaint to challenge the policy and to request damages for the alleged violations of their civil rights.

Following a non-jury trial, the district court enjoined the religious meetings but found the Bible distribution claim to be moot. It further held that the District's policy was not facially unconstitutional and that the state prayer statute was never at issue since the District denied reliance on it for its actions. The court also refused to award either compensatory or punitive damages.

Both parties now appeal. Bell and McCord assert that the district court should have granted relief on all claims. The District, in turn, argues first that plaintiffs had no standing to bring this action, and second that enjoining the meetings violated the students' freedom of speech and religion. We affirm the district court in most respects but reverse and remand on the issue of damages.

I.

BACKGROUND

Joann Bell and Lucille McCord each have several children who have attended Little Axe School. During the 1980–81 school year, their children told them of certain religious meetings held before class every Thursday morning. Testimony in the record indicates that other students asked the Bell and McCord children why they had not chosen to attend the meetings, asserting that they therefore must not believe in God. Consequently, Bell and McCord notified defendant Holleyman, then school superintendent of the district, of their concern. Upon investigation, he found that several teachers were supervising and participating in religiously-oriented meetings involving students and non-students on Thursdays between 8:00 and 8:25 a.m. He ordered the meetings suspended until the school board could consider the matter.

1. The Little Axe School District No. 70 of Cleveland County, Oklahoma, operates one school for

kindergarten through grade nine.

The meetings had been started by several students and a faculty sponsor so "that youth would be influenced in a positive way to seek God and good in their own lives and in others."[2] Pl.Ex. 35. The meetings were advertised by posters in the halls and announcements in school publications.[3] Between five and forty students, including elementary age schoolchildren, attended the meetings that began shortly after school buses arrived.[4] Speakers sometimes appeared at the invitation of a student, but usually at the behest of a teacher or a person unrelated to the school. The speakers included a minister, local athletes, and others speaking about how God and Christianity had benefited the speaker in his or her daily life. The program also included prayers, songs, and "testimony" of students and other individuals concerning the benefits of knowing Jesus Christ.

The school board first considered the issue at a board meeting in April 1981 before an agitated crowd. On a 4–1 vote, the board decided to permit the meetings to continue until such time as the meetings were declared unlawful. Prior to the vote, the dissenting board member, Sheri Lambeth, expressed her concern that the meetings were against the law and that the board was obliged to uphold the law. Another board member shared Lambeth's concern that the meetings were unlawful, but voted to continue them. Following the vote, the board president, Elizabeth Butts,

exclaimed, "bring on the ACLU." Tr., vol. I, at 35–36. At no time did the board or the administration solicit a legal opinion as to the constitutionality of the meetings. The meetings resumed, and the plaintiffs filed this action.[5]

After initiating this lawsuit, both plaintiffs received numerous threatening telephone calls and letters. Their children were called "devil-worshippers" by other students and, in one instance, an upside-down cross was hung on Robert McCord's locker. At the school sports banquet, their two sons who had played football, basketball, and baseball, were the only two children who were not recognized by name as being Little Axe athletes. Joann Bell was the victim of a hair pulling incident committed by a school employee and, in September 1981, the Bells' home was destroyed by a fire of suspicious origin.

The meetings continued during this time. In November 1981, the board adopted an equal access policy purporting to regulate the student use of school facilities. Although board members generally asserted that they adopted the policy to ensure freedom of speech and religion for the students and to clarify past unwritten policy, at least one member favored the policy, in part, so that the meetings would be allowed to continue. Tr., vol. V, at 986. At the meetings conducted pursuant to this policy, teachers were designated as monitors rather than sponsors or supervisors and were

2. Initially known as the "Son Shine Club," these meetings have been described variously as fellowship, prayer sessions, prayer meetings, religious sessions, sharing time, religious meetings, devotional exercises, and, as defendants prefer, sharing sessions. On the agenda handed out at one school board meeting, they were referred to as "Prayer Service/Activity." Pl. Ex. 7.

3. One poster, decorated with a cross, announced that Mike Weddington, an Oklahoma University football player, would share his Christian beliefs with the students. Mr. Weddington subsequently recounted to the students that while in high school he told the Lord that he would serve him if given the ability to play football. He further said that in two months he grew from 5'11" to 6'1" and from 160 lbs. to 190 lbs., while increasing his speed from five seconds flat to four and a half seconds in the forty yard dash.

Another poster portrayed one of the Little Axe teachers saying that she had seen a vision of Jesus Christ and had been anointed by him to lead the students of Little Axe to him. Tr., vol. I, at 32–33.

4. Virtually all students arrived in school buses between 8:00 and 8:10 a.m. Students attending the meetings could go directly into the building. Otherwise, students had to remain outside, although the gym was opened during bad weather. Students were not actually late until 8:30 a.m. when classes began, but teachers were on duty beginning at 8:00 a.m.

5. Sheri Lambeth, the dissenting board member, was named as a defendant in her official capacity only and was subsequently replaced by Michael Luther when she chose not to seek re-election.

not permitted to participate. The school, moreover, disclaimed sponsorship of the group. A student committee was formed to solicit speakers, but the format remained unchanged.

Shortly thereafter, plaintiffs amended their complaint to challenge the new policy and to seek damages for the alleged unconstitutional acts of the District. The harassment persisted and was severe enough to force plaintiffs and their families to move into the adjoining school district for the 1982–83 school year. The meetings continued until October 1982, when the District agreed to suspend the meetings and implementation of the policy pending resolution of the merits at trial.

## II.

### STANDING

At every step of this litigation, the District has asserted that plaintiffs lack standing to raise an Establishment Clause challenge to the meetings, the policy, or the Oklahoma voluntary prayer statute. The district court disagreed, rejecting the District's argument that plaintiffs had no individual standing or, alternatively, that plaintiffs had lost whatever standing they had when they moved out of the district.

As the Supreme Court recently explained, "the term 'standing' subsumes a blend of constitutional requirements and prudential considerations, ..." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citing *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). Article III requires a party to show that he personally has suffered some actual or threatened injury that can be traced to the challenged action and is likely to be redressed by a favorable decision. *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758. Beyond the constitutional requirements are a set of prudential principles: (1) the plaintiff generally must assert his own legal rights; (2) the court must refrain from adjudicating "gen-eralized grievances" most appropriately addressed by one of the other branches of government; and (3) the plaintiff's complaint must fall within the zone of interests to be protected by the particular constitutional guarantee invoked. *Id.* at 474–75, 102 S.Ct. at 759–60.

Although *Valley Forge* rejected a claim of taxpayer standing to raise an Establishment Clause challenge, the Court nevertheless discussed specifically the kind of parental claim raised by Bell and McCord. The Court recognized the standing of parents of schoolchildren "who are directly affected by the laws and practices against which their complaints are directed." *Valley Forge,* 454 U.S. at 486 n. 22, 102 S.Ct. at 766 n. 22 (quoting *Abington School District v. Schempp,* 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 1572 n. 9, 10 L.Ed.2d 844 (1963)). The Court further explained that such plaintiffs have standing "because impressionable schoolchildren [are] subjected to unwelcome religious exercises or [are] forced to assume special burdens to avoid them." *Id.* See also *McCollum v. Board of Education,* 333 U.S. 203, 206, 68 S.Ct. 461, 463, 92 L.Ed. 649 (1948) (parent of schoolchildren has standing to assert Establishment Clause violation).

In this case, plaintiffs Bell, a member of the Church of the Nazarene, and McCord, a member of the Church of Christ, testified that, as parents, they have the right to guide their children's religious education without interference at school. The district court concluded that "[t]his Court can see no reason why parents cannot, on their own behalf, assert that the state is unconstitutionally acting to establish a religious preference affecting their children." Rec., vol. IV at 1176. We agree. These parents are not merely "concerned bystanders," see *Valley Forge,* 454 U.S. at 473, 102 S.Ct. at 759, airing "generalized grievances," *id.* at 475, 102 S.Ct. at 760. Rather, they assert a specific injury that falls well within the zone of interests protected by the Establishment Clause. *See id.*

Nevertheless, the District argues that Bell and McCord lost this standing when they moved from the Little Axe School District and enrolled their children in a neighboring district. The District cites *Doremus v. Board of Education*, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952), as support for this proposition. The appeal in *Doremus* was dismissed because of the student's graduation and the failure of the appellants to establish taxpayer standing. Here, although both families continue to own property and pay taxes in the Little Axe School District, they moved because of the continuing harrassment generated by the lawsuit. Each plaintiff still has children who would be enrolled in the Little Axe School District had they not been forced to move for the physical and emotional health of their families. We do not believe principles of standing require these plaintiffs to remain in a hostile environment to enforce their constitutional rights. Moreover, plaintiffs have asserted a claim for damages based on the District's alleged violations of those rights. Even if they had moved voluntarily, they would be entitled to resolution of this claim. We conclude that Joann Bell and Lucille McCord had standing to bring this lawsuit.

## III.

## THE MEETINGS AND THE EQUAL ACCESS POLICY

When Bell and McCord first brought suit, they alleged that defendants had permitted and encouraged religious services upon school premises during the school day. After the board adopted the equal access policy to regulate student activities, Bell and McCord amended their complaint to challenge the policy as well. The policy provides as follows:

"Use of school facilities by students who meet religious, political or other Constitutionally protected purposes shall be permitted in accordance with the following principles and guidelines:

"1. Little Axe Public Schools shall not discriminate against any student, teacher, staff member or other employee on the basis of race, color, creed, religion, sex or national origin in the assignment or use of school facilities.

"2. Little Axe Public Schools shall not deny any student or employee, in the use of school facilities, the Constitutional guarantees of freedom of religion, speech, the press, association, petition and equal protection of the laws or restrict these freedoms in any manner except as essential in the performance of the school's educational purposes, to avoid substantial interference with the necessary school discipline.

"3. All students, whether as school sponsored clubs, nonsponsored student associations or individuals shall have equal access to school facilities under neutral regulations regarding the time, place and manner of use, for proper allocation of available space and supervision.

"4. No school shall sponsor or officially endorse any political or religious practice or activity by any student or employee nor sponsor or officially recognize any student club which meets for political or religious purposes. Lack of official sponsorship, endorsement or recognition shall not be used to deny any student or nonsponsored student association equal access to school facilities. Presentation of material having religious or political content as part of the academic or cultural activities of a school shall not constitute official sponsorship, endorsement or recognition.

"5. Little Axe Public School shall not compel any student to participate in a religious or political activity. No student or employee shall intentionally deceive or coerce a student to attend a religious or political meeting or to adopt a particular religious or political belief or ideology.

"6. Student use of school facilities shall not be regulated on the basis of the content of the students' meetings, except that the school may terminate meetings which are immoral, violent (or advocate violence) or interfere with the educational process. Religious speech shall receive the same rights and protections as

political and all other speech, including private voluntary prayer, reading from religious or political books and speaking about political or religious topics. The school may prohibit outside speakers at student meetings if the school affirmatively finds that the appearance of the speaker will incite violence or interfere with the educational process.

"7. School employees, while acting in their official capacities and performing their duties as school employees, shall not sponsor, support or participate in political or religious practices or activities involving students. Before or after school hours and during lunchtime, work breaks or any other time when a school employee may use his time for personal purposes, employees may engage in political and religious practices and activities, including those involving students.

"8. All students [sic] use of school facilities shall be supervised, as necessary, by the school to maintain order on the school premises. Student activities sponsored by the school may be supervised by the sponsoring individual or another school employee. Nonsponsored student activities shall be supervised in the same manner as the school supervises student behavior generally, as in hallways, lounges, study rooms, libraries, lunchrooms or open areas on the campus, or the school may assign an employee to attend and supervise the activity as an observer.

"9. The school may publish the times and locations of the meetings of all school sponsored clubs, nonsponsored associations or students who have been assigned use of school facilities, but the school shall not otherwise announce or report the activities of any nonsponsored student groups in official school publications. All student activities, including nonsponsored activities, may be announced or reported in any student publications or through use of any permitted means of student communication, such as bulletin boards, posters, flyers and oral announcements.

"10. The school may prohibit or regulate in any manner the collection or expenditure of money by or on behalf of any student, nonsponsored student association or school sponsored club relating to any activity that takes place in school facilities or on school premises."

Pl.Ex. 19.

After November 1981, the meetings were conducted pursuant to this policy. In March 1983, the district court enjoined the meetings, but held the policy facially constitutional. We affirm, but only insofar as the policy is construed to prohibit concerted religious activity on the school grounds during the school day.

### A. The Students' Free Speech Rights

■ In defense of the meetings and the policy, the District asserts the students' complementary First Amendment rights of freedom of speech and religion.[6] Although the First Amendment clearly protects religious worship and discussion, *Widmar v. Vincent*, 454 U.S. 263, 269, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981); *see Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981); *Bender v. Williamsport Area School District*, 741

---

**6.** As an individual defense for two board members whose children attend the school, the District asserts a free exercise claim. Since we agree with the Second Circuit in *Brandon v. Bd. of Educ.*, 635 F.2d 971, 976–78 (2d Cir.1980), *cert. denied*, 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981), that the students' right to the free exercise of their religion is not infringed when they are prohibited from group religious activity during school time, we limit our discussion to the free speech claim. *See also Lubbock Civil Liberties Union v. Lubbock Indep. School Dist.*, 669 F.2d 1038, 1048 (5th Cir.1982),

*cert. denied*, 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983). The District also fruitlessly argues that we should ignore binding Supreme Court precedent, *e.g., Everson v. Bd. of Educ.*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), and hold that the Framers never intended the Establishment Clause to be applied to the states, and that the Fourteenth Amendment did not incorporate that Clause. The Supreme Court explicitly rejected this argument in *Wallace v. Jaffree*, — U.S. ——, —— – ——, 105 S.Ct. 2479, 2486–90, 86 L.Ed.2d 29 (1985).

F.2d 538, 545 (3d Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 1167, 84 L.Ed.2d 319 (1985), and both students and teachers enjoy these rights, *see Widmar,* 454 U.S. at 267 n. 5, 102 S.Ct. at 273 n. 5; *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969); *Bender,* 741 F.2d at 545, these rights do not "require the government to open the use of its facilities as a public forum to anyone desiring to use them," *id.; see Perry Education Association v. Perry Local Educators Association,* 460 U.S. 37, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). However, the state may create a forum, even if not initially required to do so, *see Widmar,* 454 U.S. at 267, 102 S.Ct. at 273, and limit that forum to certain groups or a particular subject matter, *Perry,* 103 S.Ct. at 955 n. 7. Once that action is taken, a compelling state interest must be shown to justify a content-based exclusion. *See Widmar,* 454 U.S. at 270, 102 S.Ct. at 274.

■ Accordingly, we must analyze the First Amendment rights of the Little Axe students "in light of the special characteristics of the school environment," *id.* at 267 n. 5, 102 S.Ct. at 273 n. 5 (quoting *Tinker,* 393 U.S. at 506, 89 S.Ct. at 736), so that we may determine whether the Little Axe School has created a limited open forum and, if so, whether the Establishment Clause justifies restriction of the students' free speech rights. *See Bender,* 741 F.2d at 544.

The Supreme Court recently identified a university campus as a limited forum because of its policy of accommodating meetings of student organizations. *Widmar,* 454 U.S. at 267, 102 S.Ct. at 273. Similarly, the Third Circuit recognized a high school as a limited forum by virtue of its comparable policy. *Bender,* 741 F.2d at 547–49. *But see Lubbock Civil Liberties Union v. Lubbock Independent School District,* 669 F.2d 1038, 1048 (5th Cir.1982), *cert. denied,* 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d

1003 (1983); *Brandon v. Board of Education,* 635 F.2d 971, 980 (2d Cir.1980), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981). In each case, a student organization raised a free speech challenge to an administrative decision prohibiting their meetings because of the religious content. The Third Circuit in *Bender,* however, recognized that a high school differs from the university campus` considered in *Widmar.* First, the court noted, the educational mission of a high school is more circumscribed, consisting of a structured program designed "[to inculcate] fundamental values necessary to the maintenance of a democratic political system." *Bender,* 741 F.2d at 548 (quoting *Board of Education v. Pico,* 457 U.S. 853, 864, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982) (Brennan, J., for the plurality)). Thus, it was unlikely that school authorities would create a "truly open forum" of "unregulated dialogue." *Id.* Second, the court recognized that the level of maturity of high school students is notably lower than that of university students. *Id.* Despite these considerations, the court observed that "nothing precludes the existence of a forum in a high school setting," *id.,* and concluded that the high school involved was in fact a limited forum.

The reservations expressed in *Bender* apply with even greater force to an elementary school,[7] where the curriculum is far more circumscribed. More importantly, most school children are unable to appreciate *or initiate* a wide diversity of viewpoints, as demonstrated by the relatively few student organizations that actually meet at Little Axe School, such as Girl Scouts, Boy Scouts, and 4-H Clubs.

■ Nevertheless, we are reluctant to hold that an elementary school administration may never create a limited forum for the benefit of its students. The policy governing Little Axe School purports in paragraph 2 to guarantee all students and employees "freedom of religion, speech, the

---

7. Although the District tries to fashion itself as a secondary school because the school has a ninth grade class, at least seven of the remaining nine grades are classified by state law as elementary grades. *See* Okla.Stat. tit. 70, § 1–106 (1981).

press, association, petition and equal protection," rights which the policy provides may not be restricted "except as essential in the performance of the school's educational purposes." The policy, therefore, does not compromise the primary educational purpose of the school. *See Widmar*, 454 U.S. at 267 n. 5, 102 S.Ct. at 273 n. 5; *cf. Bender*, 741 F.2d at 549. Accordingly, we conclude that by adopting the equal access policy, the Little Axe Independent School District created a limited forum for the benefit of its students and employees. We must now determine whether the Establishment Clause is a sufficiently compelling interest to warrant the injunction against the religious meetings at issue.

### B. The Establishment Clause

■ We approach the task of deciding whether the Establishment Clause requires enjoining the meetings of the Son Shine Club with appreciation for the difficulty of "[preventing], as far as possible, the intrusion of either [the church or the state] into the precincts of the other." *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 1358, 79 L.Ed.2d 604 (1984) (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971)). Although total separation of the two is impossible, *id.* 104 S.Ct. at 1359, we recognize the special concern for religious neutrality in the public school setting:

"The public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools, to avoid confusing, not to say fusing, what the Constitution sought to keep strictly apart. 'The great American principle of eternal separation'—Elihu Root's phrase bears repetition—is one of the vital reliances of our Constitutional system for assuring unities among our people stronger than our diversities. It is the Court's duty to enforce this principle in its full integrity."

*McCollum v. Board of Education*, 333 U.S. 203, 231, 68 S.Ct. 461, 475, 92 L.Ed. 649 (1948) (Frankfurter, J., concurring). *See Wallace v. Jaffree*, —— U.S. ——, —— n. 51, 105 S.Ct. 2479, 2492 n. 51, 86 L.Ed.2d 29 (1985).

In determining whether the meetings as conducted pursuant to the policy violated the proscription of the Establishment Clause, the district court applied the test first articulated in *Lemon*, 403 U.S. at 612–13, 91 S.Ct. at 2111: Did the District's action in permitting the meetings have a secular purpose; did it have a primary effect that neither advanced nor inhibited religion; and, finally, did it avoid an excessive entanglement of government with religion? *See Wallace*, —— U.S. at ——, 105 S.Ct. at 2489; *Widmar*, 454 U.S. at 271, 102 S.Ct. at 275. Unless all three questions are answered affirmatively, the District's action was properly enjoined.

#### 1. Secular Purpose

■ The District asserts a secular purpose in the commitment to protecting the students' freedom of speech and religion. The testimony of the individual defendants generally supports this assertion. The district court found to the contrary, however, and we agree. The District's behavior belies its avowed secular purpose and indicates that the policy was actually adopted to conceal a pre-eminent religious purpose.

The District contends that the policy was adopted merely to clarify a former unwritten equal access policy. Yet several witnesses, including several defendants, testified that either they were unaware of a prior policy or did not know what the policy provided. In fact, during the time of the supposed unwritten policy, at least two student groups were denied access to school facilities. Moreover, following the adoption of the policy, certain aspects of the meetings changed: teachers were told they could no longer participate and were designated as monitors rather than supervisors or sponsors; and a student committee was formed to solicit speakers, thereby replacing the previous active involvement of the teachers. If the earlier policy was substan-

tially the same, we can only assume that it was not enforced at meetings of the Son Shine Club.

 Most importantly, the District's ultimate motive is revealed by its subsequent implementation of the policy. In October 1983, seven months after the district court enjoined the meetings, the school administration required the junior high classes to attend a religious assembly at approximately 1:00 p.m. At the assembly, a local minister introduced an evangelist known as "Yo-Yo" Collins who spoke to the assembled students. After he and his wife led the students in a variety of modern religious songs, Mr. Collins "testified" about an accident that had physically disabled him and about how God had loved him and helped him. He then invited the students to attend an ongoing revival that evening at the Little Axe Baptist Church. He also offered them autographed pictures, literature, and records which were handed out during and after his speech.[8]

When plaintiffs sought a contempt citation for this apparent violation of the injunction, the District justified the assembly as a cultural activity with religious content specifically permitted by paragraph four of the policy which, the District argued, had been held facially constitutional by the district court. The District also justified the assembly by pointing to the district court's suggestion that religious meetings might be appropriate if held at other hours of the day, despite the plain language of the court's opinion that the other hours must be those following the hours of compulsory attendance. Most preposterously, the District argued that the assembly was not the same type of activity encompassed by the injunction, asserting the following distinctions. First, the meetings of the Son Shine Club occurred before classes actually started whereas the assembly was held in the

middle of the school day. Second, the meetings were directed by the students themselves, while the assembly was initiated by the administration. Third, the meetings were voluntary and no classes or extracurricular activities were cancelled for the purpose of facilitating attendance; in contrast, classes were cancelled to compel student attendance at the assembly. The district court correctly characterized the District's contention as "so patently absurd that it is unworthy of further comment," and held the "religious meeting" to constitute an act prohibited by the injunction.[9] Order, November 30, 1984, at 2.

The District's blatant disregard for the clear import of the court's injunction convinces us that the District's "pre-eminent purpose" in permitting these meetings to be held was religious in nature and that the policy was adopted to conceal that purpose. "[N]o legislative recitation of a supposed secular purpose can blind us to that fact." *Stone v. Graham*, 449 U.S. 39, 41, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980); *see Lubbock*, 669 F.2d at 1044–45. *See Wallace*, —— U.S. at ——, 105 S.Ct. at 2500 (Connor, J., concurring) ("[c]ourts are capable of distinguishing a sham secular purpose from a sincere one."). Nevertheless, because of our concern that our decision rest on a firm conviction that the District's actions violated the Establishment Clause, we also consider the District's action in light of the second and third elements of the tripartite test.

### 2. Primary Effect

 The district court also found that the District's action had the primary effect of advancing religion. "What is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion." *Lynch*, 104 S.Ct. at 1368 (O'Connor, J., concurring). Under this test, it is

---

8. These facts are taken from plaintiffs' application for a contempt citation. Since defendants did not deny the allegations in their responsive pleading, we accept plaintiffs' allegations as true.

9. In lieu of a contempt citation, the court ordered the District to post a $10,000 bond to secure future compliance with the injunction.

irrelevant that a practice may be non-denominational or non-sectarian, because "the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all." *Wallace,* —— U.S. at ——, 105 S.Ct. at 2486. A religious practice, no matter how universal, inherently "excludes those who espouse no religious beliefs at all."[10] *Bender,* 741 F.2d at 554; *see Everson v. Board of Education,* 330 U.S. 1, 15–16, 67 S.Ct. 504, 511–512, 91 L.Ed. 711 (1947). The question, therefore, is whether *religion* is advanced. *Lubbock,* 669 F.2d at 1045 n. 15.

*Widmar* concluded that, in the context of a public university, any benefits deriving from an open forum that permitted religious meetings would be incidental in nature and would confer no imprimatur of state approval on the religious practices. *Widmar,* 454 U.S. at 273–74, 102 S.Ct. at 276–77. The context, however, is critical. The Court first recognized that, as young adults, university students are less impressionable than younger students and should be able to appreciate the neutrality of the university's policy. *Id.* at 274 n. 14, 102 S.Ct. at 276 n. 14. Second, the forum was available to a broad spectrum of student groups—over 100—which indicated the predominantly secular effect of the policy and conferred merely a general benefit on religious groups. *Id.* at 274, 102 S.Ct. at 276. Students were unlikely to infer university support for any particular group in light of the large number of groups meeting on

campus. *Id.* at 274 n. 14, 102 S.Ct. at 276 n. 14.

Based on these factors, *Bender* distinguished the university setting from that of a high school, finding that the latter presents "heightened dangers in the context of the Establishment Clause." *Bender,* 741 F.2d at 552. High school students are less able to appreciate a spirit of neutrality toward religion, a problem compounded by the fact that attendance for most students is compulsory under state law. *Id.* Moreover, since the high school environment is far more structured and controlled than that of a college campus, involuntary contact between non-participating students and religious groups is inevitable. Students are less able to overlook the activities of such groups and thus would be more likely to perceive a message of endorsement by school authorities. *Id.* Finally, the requirement of teacher monitoring, regardless of the degree of actual participation, "necessarily must impart the impression to students that the school's authority and ... endorsement [are] implicated in the relevant activity...." *Id.*

We believe that an elementary school cannot be compared to either a university campus or a high school. Elementary schoolchildren are vastly more impressionable than high school or university students and cannot be expected to discern nuances which indicate whether there is true neutrality toward religion on the part of a school administration.[11] A child, for example, is unlikely to distinguish any difference between school sponsorship and mere fac-

---

10. Yet we recognize that the sectarian or denominational character of a practice may contribute to its divisive effect within a community. *See infra* at 1406–1407; *Bender,* 741 F.2d at 561.

11. Dr. Thomas J. Berndt, a specialist on psychological development of children and adolescents, testified on behalf of plaintiffs that a child between the ages of 6 and 11 does not have the cognitive ability to "appreciate the difference between his point of view and that of somebody else. It's as if he simply assimilates and takes, unthinkingly, what other people have taught to him." Tr., vol. II, at 209. Children at this age are particularly influenced by authority figures, including teachers. *Id.* at 210. As children move into their adolescent years, ages 11–

15, peer influence takes on increasing weight. *Id.* at 211. It is not until the age of 18 that the child fully develops the ability to make decisions independent of authority figures and peers. *Id.* at 212. (Defendants' expert, Dr. Paul Schmidt, a clinical psychologist, basically agreed with this view of child development. Tr., vol. V, at 868–73.) When Dr. Berndt was asked specifically whether a student in the fifth or sixth grade could make an informed choice about attending a religious meeting, he responded: "I think he could not because the decision would be based largely on whether the peers seem to support that activity and whether the teacher seems to support that activity." *Id.* at 217.

ulty supervision.[12] Although under the policy teachers no longer actively participate in the meetings, they had previously done so, and several continued to attend each meeting. Since the policy requires only one teacher to monitor student meetings, the attendance by several teachers unmistakably expressed their personal endorsement of religion and, by implication, that of the school. We believe that the presence of even one teacher would produce the same aura of school authorization and approval.

Moreover, in contrast to the fluid environment of a university campus, the highly structured environment of the Little Axe School furthered the appearance of school endorsement of the Son Shine Club. Few other student organizations ever met at the school, and none met during the morning between the arrival of the buses and the first class. Although virtually all students arrived between 8:00 and 8:10 a.m., they were not permitted inside the building except to attend meetings of the Son Shine Club.[13] In addition, posters prominently displayed in the halls advertised the religious nature of the meetings and invited students to participate. Students not only were aware of the meetings, they could not avoid contact with participants.[14]

These considerations reveal that meetings of the Son Shine Club conferred an imprimatur of state approval on religion in the Little Axe School District. "To an impressionable student, even the mere appearance of secular involvement in religious activities might indicate that the state has placed its imprimatur on a particular religious creed. This symbolic inference is too dangerous to permit." *Lub-* *bock,* 669 F.2d at 1045 (quoting *Brandon,* 635 F.2d at 978).

The District argues that since these meetings were voluntary, any false impression of school endorsement was removed. We disagree. This fact is not relevant to Establishment Clause analysis.

"Neither the fact that the prayer may be denominationally neutral nor the fact that its observance on the part of the students is voluntary can serve to free it from the limitations of the Establishment Clause.... When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain."

*Engel v. Vitale,* 370 U.S. 421, 430–31, 82 S.Ct. 1261, 1266–67, 8 L.Ed.2d 601 (1962). Reflecting on this language in *Engel,* the Court observed in *Wallace* that

"[t]his comment has special force in the public-school context where attendance is mandatory.... 'That a child is offered an alternative may reduce the constraint, it does not eliminate the operation of influence by the school in matters sacred to conscience and outside the school's domain. The law of imitation operates, and non-conformity is not an outstanding characteristic of children.' *See also Abington School District v. Schempp,* 374 U.S., at 290 [83 S.Ct., at 1607] (Brennan, J., concurring); *cf. Marsh v. Chambers,* 463 U.S. 783, 792 [103 S.Ct. 3330, 3335–3336, 77 L.Ed.2d 1019] (1983) (distinguishing between adults not susceptible to 'religious indoctrination' and children subject to 'peer pressure')."

---

**12.** We question whether anyone in the present case truly understood the distinction since one teacher, Becky Ernest, testified that she was the "sponsor" of the group. Tr., vol. III, at 588. Moreover, Dr. Berndt testified that even student sponsored religious activities occurring "during the school day and on school property would make it difficult for the young child to distinguish that from an endorsement by the school." Tr., vol. II, at 241.

**13.** In bad weather, the gym was opened for the students. Those who had not eaten breakfast could also go to the cafeteria.

**14.** The meetings were held in the band room. Students with instruments were forced to wait until the meeting adjourned to store their instruments. Other students met the group on the way to class when the bell rang. Occasionally, the meetings ran late and participants would arrive at class after the final bell.

*Wallace,* —— U.S. at —— n. 51, 105 S.Ct. at 2492 n. 51 (quoting *McCollum,* 333 U.S. at 227, 68 S.Ct. at 473 (Frankfurter, J., concurring)).

Nor does it matter that the meetings took place before classes actually began. The students were under the control and supervision of the school from the moment they boarded the school bus. *See* Okla. Stat. tit. 70 § 6–114 (1981). Even more critically, it was the "compulsory education machinery that [drew] the students to school and [provided] any audience at all for the religious activities, whether the buses [had] run or the school day 'officially' begun." *Lubbock,* 669 F.2d at 1046; *see Bender,* 741 F.2d at 553.

■■■ Despite the District's consistent disavowal of sponsorship, these individual elements indicate an overwhelming aura of endorsement and approval of the meetings on the part of the school administration, resulting in the students' inevitable perception of prayer as a "favored practice." *Cf. Wallace,* —— U.S. at ——, 105 S.Ct. at 2492. The district court correctly concluded that the District's action in permitting the meetings had the primary effect of advancing religion.

### 3. Excessive Entanglement

■■■ The final inquiry under the *Lemon* test focuses on whether the District's action in permitting the meetings avoided excessive entanglement with religion. "The objective is to prevent, as far as possible, the intrusion of either [the church or state] into the precincts of the other." *Lemon,* 403 U.S. at 614, 91 S.Ct. at 2112. We agree with the district court that excessive entanglement was not avoided.

In resolving this issue, our attention is again drawn to the requirement that the school monitor all student meetings. This provision was notably absent from the university policy in *Widmar,* but contributed to the findings of entanglement in both *Bender* and *Lubbock. See Bender,* 741 F.2d at 556, *Lubbock,* 669 F.2d at 1047. Although the requirement is legitimately concerned with maintaining order at meet-

ings within the school, it resulted in the attendance, supervision, and occasional participation by one or more teachers while on duty and while being compensated by the school district. This would be both appropriate and desirable at any other student meeting, but in the context of meetings with religious content it impermissibly entangled the school administration in religion.

In addition to the monitoring requirement, the policy requires the administration to scrutinize the content of meetings and to terminate those "which are immoral, violent (or advocate violence) or interfere with the educational process." Pl.Ex. 19, ¶ 6. Again, while this kind of administrative determination might be appropriate for any other student meeting, it would require a determination by the administration as to whether any particular religious content is immoral, violent, or likely to interfere with the educational process. We believe any such determination would necessarily entangle the administration in deciding religious issues.

These and a number of other factors indicate the "intimate and continuing relationship" between the school and the Son Shine Club. *See Lemon,* 403 U.S. at 622, 91 S.Ct. at 2116; *Bender,* 741 F.2d at 556. As permitted under the policy, the meetings were advertised in the school by posters with prominent religious indicia, and were held in school facilities under official supervision and responsibility. *See id.* at 556–57; *Lubbock,* 669 F.2d at 1047; *Brandon,* 635 F.2d at 979. Most importantly, the state's compulsory attendance laws provided the opportunity and audience for the meetings.

■■■ A final consideration in determining whether state action has become excessively entangled in religion is the question of political divisiveness within a community. *See Lemon,* 403 U.S. at 622–23, 91 S.Ct. at 2115–16. The question of whether the school board would permit the meetings to continue fomented political divisiveness both before and after the lawsuit was

filed.[15] Not only was the issue controversial within the community, the school board was forced to address it in an attempt to resolve these conflicts. This only further embroiled local government in an issue that had already divided a community along religious lines. The district court found excessive entanglement inescapable in this context, and we agree.

■■■ We also believe that in a public school that includes elementary-age schoolchildren, a violation of the Establishment Clause of this degree offers a sufficiently compelling interest to justify a content-based distinction in the limited forum created in this case. *See Widmar*, 454 U.S. at 273, 102 S.Ct. at 276; *cf. Bender*, 741 F.2d at 557–60. Particularly in light of the expert testimony regarding the developmental stages of children, *see* note 11 *supra*, a limited forum for students under fourteen years of age cannot compare to one created for adult university students. In addition, an Establishment Clause violation weighs much more heavily when younger, more impressionable students are involved. We therefore conclude that the district court properly enjoined the meetings of the Son Shine Club.[16]

■■■ We further hold that the policy promulgated by the District is unconstitutional insofar as the District or the school construes it to permit concerted religious activity on the school grounds during the school day. Those sections which specifically protect such religious activity cannot withstand scrutiny under the Establishment Clause. By this holding we do not express hostility toward religion as the District fears. We recognize that accommodation is necessary in some instances to balance competing constitutional interests. *See Lynch*, 104 S.Ct. at 1359. Yet we believe that religious activity in the public schools demands exceptional care in preventing the intrusion of the church into the precincts of the state and ultimately requires stricter separation than does a university campus or a public square. To hold otherwise would inhibit the development in our schoolchildren of toleration and mutual respect for a diverse range of beliefs—essential values in the pluralistic society we have cultivated.

## IV.

## VOLUNTARY PRAYER STATUTE AND BIBLE DISTRIBUTION

■■ Bell and McCord additionally sought to have the Oklahoma voluntary prayer statute, Okla.Stat. tit. 70, § 11–101.1 (1981), declared unconstitutional and unenforceable. The district court declined to do so, finding that the District had not relied on the statute in its actions. Because our examination of the record does not reveal this finding to be clearly erroneous, *see* Fed.R.Civ.P. 52(a), we find no abuse of discretion in the court's refusal to issue an injunction. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

■■ Plaintiffs also alleged that the District had permitted Bibles provided by the Gideon International Organization to be distributed to students in 1981. They sought to enjoin further distribution. At trial, defendants stipulated that no such distribution had occurred since that time; that the Gideons had said they would no longer distribute Bibles at Little Axe or

---

15. Chief Justice Burger, writing for the Court in *Lynch*, noted that a plaintiff may not cite community turmoil ensuing from a lawsuit as evidence of entanglement. *Lynch*, 104 S.Ct. at 1365. Nevertheless, in this case, events after the lawsuit was filed merely indicate the depth of community agitation. The controversial nature of the issue was already apparent in the questions directed at the children and the turmoil at the board meeting preceding the lawsuit.

16. Our conclusion is not affected by Congress's recent enactment of the Equal Access Act, Pub.L. 98–377, 98 Stat. 1302 (1984). The act would permit student-initiated, voluntary religious meetings during noninstructional time at those secondary schools which have created a limited forum. The constitutionality of this act has not been determined, nor is it before this court. The presence of one secondary grade does not make the Little Axe School a secondary school within the meaning of Okla.Stat. tit. 70, § 1–106 (1981).

any other school in Oklahoma; and that defendants had no plans or policy to distribute Bibles from any source. The court therefore found the issue of Bible distribution to be moot. This finding is not clearly erroneous, and again we find no abuse of discretion by the trial court.

## V.

## DAMAGES

### A. Compensatory Damages

In their amended complaint, Bell and McCord sought $20,000 in actual damages from the individual defendants for the violation of their constitutional rights. The district court denied that request, concluding that "the defendants' actions in adopting the policy at issue cannot be said to have been the proximate cause of any injuries inflicted by others." Rec., vol. IV, at 1185. It appears from the record that the court only considered incidents such as the hair pulling, house burning, and threats by third parties in determining that no causal relationship had been established between the Establishment Clause violations by defendants and plaintiffs' injuries. We believe that the court viewed the issue too narrowly.

A distinction must be made between the injuries caused by others and those inflicted by the actions of defendants that violated the Establishment Clause. For the reasons set out below, we believe that plaintiffs are entitled to recover compensatory damages for the loss of the inherent value of their rights under the Establishment Clause, even if they are unable to demonstrate consequential injury.

The resolution of this issue follows from the Supreme Court's analysis in *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). There, the Court held that plaintiffs who had suffered injury to their procedural due process rights but had failed to demonstrate consequential injury were entitled to recover nominal damages of one dollar only. However, the Court limited its holding to the procedural due process violation before it and directed

courts to examine common law tort rules as an "appropriate starting point" in determining principles of compensation relevant to a particular claim under 42 U.S.C. § 1983. *Id.* at 258, 98 S.Ct. at 1049. The Court explained:

"It is not clear, however, that common-law tort rules of damages will provide a complete solution to the damages issue in every § 1983 case. In some cases, the interests protected by a particular branch of the common law of torts may parallel closely the interests protected by a particular constitutional right. In such cases, it may be appropriate to apply the tort rules of damages directly to the § 1983 action. In other cases, the interests protected by a particular constitutional right may not also be protected by an analogous branch of the common law of torts. In those cases, the task will be the more difficult one of adapting common-law rules of damages to provide fair compensation for injuries caused by the deprivation of a constitutional right.

"Although this task of adaptation will be one of some delicacy—as this case demonstrates—it must be undertaken. The purpose of § 1983 would be defeated if injuries caused by the deprivation of constitutional rights went uncompensated simply because the common law does not recognize an analogous cause of action. In order to further the purpose of § 1983, the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question—just as the common-law rules of damages themselves were defined by the interests protected in the various branches of tort law. We agree with Mr. Justice Harlan that 'the experience of judges in dealing with private [tort] claims supports the conclusion that courts of law are capable of making the types of judgment concerning causation and magnitude of injury necessary to accord meaningful compensation for invasion of [constitutional] rights.' *Bivens v. Six Unknown Fed.*

*Narcotics Agents,* supra [403 U.S. 388] at 409, 29 L.Ed.2d 619, 91 S.Ct. 1999 [at 2011 (1971)] (Harlan, J., concurring in judgment)."

*Id.* at 258–59, 98 S.Ct. at 1049–50 (citations omitted).

The Court analyzed the nature of procedural due process rights, emphasizing that "[p]rocedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Id.* at 259, 98 S.Ct. at 1050. The Court rejected a proposed analogy between the deprivation of procedural rights and the doctrine of presumed damages in the common law of defamation. Acknowledging that "those forms of defamation that are actionable *per se* are virtually certain to cause serious injury to reputation, and that this kind of injury is extremely difficult to prove," *id.* at 262, 98 S.Ct. at 1051, the Court decided that "it is not reasonable to assume that every departure from procedural due process, no matter what the circumstances or how minor, inherently is as likely to cause distress as the publication of defamation *per se* is to cause injury to reputation and distress," *id.* at 263, 98 S.Ct. at 1052. Moreover, the Court contrasted the immediately distressing effect of defamation *per se* with the situation where a person may not even know that procedures were deficient until he consults an attorney to challenge a perceived substantive deprivation. *Id.*

It is precisely the unusually technical nature of a procedural due process violation that can lead to the ambiguity in causation that concerned the district court.[17]

Such ambiguity provoked a need for the plaintiffs in *Carey* to prove that they actually suffered distress. The Court concluded that, in the context of a procedural due process violation, "neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury actually was caused." *Id.* at 264, 98 S.Ct. at 1052. The Court's holding is limited to the proposition that a procedural due process violation does not inherently precipitate the kind of injury analogous to one of the common law torts that permitted the recovery of presumed damages. Other constitutional deprivations, however, may fare well in such comparison—a comparison that *Carey* requires us to make.

This Circuit held without elaboration in *Corriz v. Naranjo,* 667 F.2d 892, 897 (10th Cir.1981), *cert. dismissed,* 458 U.S. 1123, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1982), that presumed damages are available for violations of substantive constitutional rights. *Corriz* involved the deprivation of liberty interests in bodily integrity and arrest based on probable cause. The interests at stake there can be analogized to dignitary torts,[18] which were remediable by presumed damages at common law.

Relying on *Carey's* warning that the proper damage award may vary depending on the nature of the constitutional right at issue, the Eighth Circuit used this analogy to uphold an award of presumed damages for a plaintiff who had suffered similar deprivations. *See Herrera v. Valentine,* 653 F.2d 1220, 1227–31 (8th Cir.1981). In *Herrera,* an Indian woman was assaulted and unlawfully arrested by a police offi-

---

**17.** In *Carey,* the Court was concerned that the effect of the substantive deprivation was indistinguishable from that of the procedural deprivation. Here we need only distinguish the actions of the District which caused a deprivation of substantive rights from those actions initiated by third parties.

**18.** Dignitary torts

"involve some confrontation with the plaintiff in person or some indirect affront to his personality—assault, battery, false imprisonment,

malicious prosecution, intentional infliction of mental anguish, libel and slander, invasion of privacy, alienation of affections are all in this category. These torts have their statutory and constitutional analogues, so that essentially the same sort of interests may be protected under federal or state civil rights statutes or under the federal Constitution."

D. Dobbs, Remedies, § 7.1 at 509 (1973) (footnote omitted), *quoted in Herrera v. Valentine,* 653 F.2d 1220, 1230 n. 9 (8th Cir.1981).

**1410**

cer.[19] In affirming her substantial damage award, the court explained:

> "Our aim here is simply to distinguish the substantive rights involved in this case from the right that was involved in *Carey*. The Court in *Carey* determined that the *procedural* right at issue there was nothing more than a mechanical process designed to avoid the mistaken or wrongful infringements of other *substantive* constitutional guarantees. In this case, by contrast, substantive constitutional rights, highly prized in our federal system of government, are clearly at stake."

*Id.* at 1230 (emphasis in original). The court viewed part of the plaintiff's injury as the loss of her rights: "To secure complete satisfaction, damage awards must take account of the intrinsic dimension that envelopes each substantive constitutional right." *Id.* at 1228. The damage award was therefore necessary to vindicate fully those rights. "Many substantive constitutional guarantees may be violated without accompanying consequential or 'actual' injury. If consequential injury were the touchstone for substantial compensatory awards, many blatant constitutional violations would remain unredressed." *Id.* at 1228 n. 7; *see also Owen v. Lash,* 682 F.2d 648, 657–59 (7th Cir.1982) (Retired Justice Stewart discussing *Carey* and *Herrera* ); Note, *Herrera v. Valentine: Presumed Damages for Violations of Substantive Constitutional Rights,* 28 S.D.L.Rev. 221 (1982); *see generally,* Note, *Damage Awards for Constitutional Torts: A Reconsideration after Carey v. Piphus,* 93 Harv.L.Rev. 966 (1980).

Analogizing deprivations of these rights to dignitary torts, the *Herrera* court recognized that it is difficult to place a value on injuries resulting from invasion of dignitary expectations since they are often not economic losses. *Herrera,* 653 F.2d at 1230; *see* n. 2 *supra.* Accordingly, courts have awarded general damages without

specific proof of emotional harm. *Id.* (quoting D. Dobbs, *Remedies,* § 7.3 at 529 (1973)). The court read *Carey* to implicitly authorize presumed damages for deprivations analogous to these kinds of torts where injury is almost certain yet difficult to prove. *Id.* at 1230. *Accord Brandon v. Allen,* 719 F.2d 151, 154–55 (6th Cir.1983) (remanding compensatory damages award for consideration of the value of the deprivation of plaintiffs' right to enjoy the security of life and limb), *rev'd on other grounds,* — U.S. —,' 105 S.Ct. 873, 83 L.Ed.2d 878 (1985); *see Bauer v. Norris,* 713 F.2d 408, 413–14 (8th Cir.1983); *see also Williams v. Trans World Airlines, Inc.,* 660 F.2d 1267, 1272 (8th Cir.1981) ("[D]amages for emotional harm are to be presumed where there is an infringement of a substantive constitutional right."); *Halperin v. Kissinger,* 606 F.2d 1192, 1207–08 and n. 100 (D.C.Cir.1979), *aff'd in part,* 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981) (Because the substantive right to be free from unlawful searches was "of a much different character" than the right to procedural due process at issue in *Carey,* damages could be "inferred from the circumstances" of the case.); *Mickens v. Winston,* 462 F.Supp. 910, 913 (E.D.Va.1978), *aff'd,* 609 F.2d 508 (4th Cir.1979) (Compensatory damages may be awarded without proof of actual injury since "official racial segregation is inherently injurious. . . ."). *But see Freeman v. Franzen,* 695 F.2d 485, 492–93 (7th Cir. 1982) (damage award for deprivation of substantive constitutional right requires proof of consequential harm).

 The present case, however, involves interests that are not directly analogous to dignitary torts. The First Amendment protects "the individual's freedom to believe, to worship, and to express himself in accordance with the dictates of his own conscience." *Wallace,* — U.S. at —, 105 S.Ct. at 2486. It prevents the government from intruding on these interests

---

**19.** The substantive rights at issue in *Herrera* included liberty interests in freedom from punishment through bodily harm, false arrest, the right to medical assistance when in custody,

freedom from unreasonable governmental intrusions into privacy, and the Fifth Amendment right to counsel. *Herrera,* 653 F.2d at 1229.

through repression of a particular point of view, for instance, or by favoring a particular religion at the expense of those who have different beliefs. The Establishment Clause therefore functions to preserve freedom of religious belief as well as to safeguard the social and political participation of all persons, regardless of their religious preference. Like its complementary clauses, it creates a right of public participation which the government may not deny. *Cf.* Note, *Constitutional Torts,* 93 Harv.L.Rev. at 978–79 & n. 82.

Before *Carey,* several courts recognized the intrinsic value of First Amendment rights. In *Tatum v. Morton,* 562 F.2d 1279 (D.C.Cir.1977), a group of plaintiffs participated in a prayer vigil on the White House sidewalk. After refusing police orders to disperse, they were arrested. The district court, finding that the arrests were unlawful and had deprived plaintiffs of their First Amendment right to demonstrate peacefully, awarded compensatory damages of $100 per plaintiff, but rejected their claim for punitive damages. The court of appeals reversed the token award of damages, stating that:

"The right to demonstrate is a significant strand of the cluster of First Amendment rights. The vindication of these rights warrants more than token acknowledgement.... Compensatory damages embrace more than recompense for monetary injury ... as is evident from amounts for pain, suffering, and humilation.... It is in the public interest that there be a reasonably spacious approach to a fair compensatory award for denial or curtailment of the right to demonstrate. The district court's limited approach cannot stand."

*Id.* at 1282.

In a similar case, *Dellums v. Powell,* 566 F.2d 167 (D.C.Cir.1977), a congressman and a number of other persons were arrested on the steps of the United States Capitol while engaged in a protest against the war in Vietnam. Each class member was awarded $7,500 for violation of First Amendment rights. While recognizing the deprivation as implicitly harmful, *id.* at 195, the court reversed the damage award as excessive, noting that it "must be proportional to the loss involved insofar as it seeks to compensate intangible injuries. The jury cannot simply be set loose to work at its discretion informed only by platitudes about priceless rights." *Id.* at 195–96. The court considered the quantum of damages to be awarded for a First Amendment violation

"no less administrable than damage awards for other intangible interests protected by the Constitution or at common law. The interest in freedom from apprehension of immediate invasion of one's person, protected for hundreds of years by the law of assault, is only one example of a non-quantifiable interest whose recompense in money damages is routinely left to a jury under proper instructions. The interest protected by the First Amendment in the context of this case is no less certain of quantification or conceptualization."

*Id.* at 195.

It is thus apparent that prior to *Carey* deprivations of First Amendment rights were compensable by substantial, although not extravagant, damage awards. *Carey,* however, directs us to look for an analogous common law tort that permitted recovery of presumed damages.[20] We believe that voting rights provide the appropriate analogy for First Amendment deprivations.[21] Like the First Amendment,[22]

---

**20.** In *Familias Unidas v. Briscoe,* 619 F.2d 391, 402 (5th Cir.1980), the Fifth Circuit ruled that, under *Carey,* a deprivation of First Amendment rights did not entitle a plaintiff to presumed damages. However, the court neglected to analyze the interests at stake as mandated by *Carey.*

**21.** Carey specifically recognized that voting rights cases have permitted presumed damages. *Carey,* 435 U.S. at 264–65 & n. 22, 98 S.Ct. at

1052–53 & n. 22. Moreover, the Court noted that "[t]he commonlaw rule of damages for wrongful deprivations of voting rights embodied in *Ashby v. White* would, of course, be quite relevant to the analogous question under § 1983." *Id.* at n. 22. *See* Love, *Damages: A*

voting rights assure a person of the right to express opinion and the right to participate in the public forum. *See generally* L. Tribe, *American Constitutional Law*, ch. 13 (1978). The deprivation of the right to vote has long been awarded substantial damages without requiring proof of consequential injury. *See* Note, *Constitutional Torts*, 93 Harv.L.Rev., at 969 & n. 16; Annot., 153 A.L.R. 109 (1944). In *Ashby v. White*, 92 Eng.Rep. 126 (1703), the House of Lords reinstated a damage award of 200 pounds for violation of the right to vote, adopting an opinion holding that deprivation of a civil right is compensable even if difficult to prove. Two centuries later, in *Nixon v. Herndon*, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927), the Supreme Court reversed the dismissal of a complaint alleging $5,000 in damages for the unconstitutional denial of plaintiff's right to vote. Since election results are usually unaffected by a single vote, the damages can only be presumed from the injury to a plaintiff's rights. As described by the Eighth Circuit in *Wayne v. Venable*, 260 F. 64, 66 (8th Cir.1919), the right to vote is "so valuable that damages are presumed from the wrongful deprivation of it without evidence of actual loss."

These cases uniformly recognize the inherent value of the right to vote, a right of public participation that evokes many of the same interests protected by the First Amendment, including the Establishment Clause. Just as the right to vote renders our government accountable for its political actions, the Establishment Clause renders the government accountable for its actions that cultivate religion. The Establishment Clause, if anything, is broader in its protection, since it emphatically rejects the principle of majoritarian rule. To en-

sure full vindication of these rights, and to deter similar violations, we believe that a plaintiff need not prove consequential injury to recover damages for the violation of a First Amendment right. As Justice Holmes has pointed out, "the deprivation of a [person's] political and social rights properly may be alleged to involve damage to that amount, capable of estimation in money." *Giles v. Harris*, 189 U.S. 475, 485, 23 S.Ct. 639, 641, 47 L.Ed. 909 (1903).

Punitive damages do not serve fully the deterrent purposes of section 1983. *See Owen v. City of Independence*, 445 U.S. 622, 651–52, 100 S.Ct. 1398, 1415–16, 63 L.Ed.2d 673 (1980); *Herrera*, 653 F.2d at 1227. They are limited to reckless deprivations of constitutional rights, *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983), and are restricted by various immunity defenses as well as the ability of a defendant to pay. These restrictions, in many instances, will lead to results where a plaintiff recovers a token $1.00 as nominal damages for the violation of important constitutional rights, or where plaintiffs with comparable deprivations recover unequal amounts simply because of a fortuitous difference in defendants. With such limits on recovery, prospective plaintiffs may not be sufficiently motivated to litigate and vindicate their constitutional rights. *See* Love, *Constitutional Damages*, 67 Calif.L.Rev. at 1263; *cf. Herrera*, 653 F.2d at 1228 n. 7. "[A]chieving a proper level of deterrence depends upon the granting of full compensation." Note, *Constitutional Torts*, 93 Harv.L.Rev. at 982. Accordingly, we believe that plaintiffs in this action were entitled to an award of compensatory damages for the violation of their First Amendment rights,

---

*Remedy for the Violation of Constitutional Rights*, 67 Calif.L.Rev. 1242, 1283 n. 342 (1979).

22. First Amendment rights are intimately linked to ensure full political, social, and religious expression and participation in our society. The Court has identified the individual's freedom of conscience as the central liberty that unifies these rights. *See Wallace* —— U.S. at —— & n. 35, 105 S.Ct. at 2487 & n. 35. They should not

be distinguished for purposes of compensatory damage awards. Although it is true that the tort of defamation implicates First Amendment concerns, it does so in *opposition* to those concerns. *See* Love, *Constitutional Damages*, 67 Calif.L. Rev. at 1265–66. Voting rights, on the other hand, protect values similar to those embraced by the First Amendment.

without requiring proof of consequential harm.

### B. Punitive Damages

■ The district court concluded that "the defendants ... were not guilty of such 'willfulness' or 'maliciousness' as required by law to entitle plaintiffs to the punitive damages they seek." Rec., vol. IV, at 1185. In *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632, however, the Supreme Court held that punitive damages are available under section 1983 for conduct which is "shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* 103 S.Ct. at 1640. This circuit had previously adopted this standard of conduct in *Silver v. Cormier*, 529 F.2d 161, 163 (10th Cir.1976). Accordingly, we remand on this issue as well. The district court should reconsider the issue of punitive damages under the standard set out in *Smith v. Wade*.

In conclusion, we affirm the judgment of the district court enjoining the meetings of the Son Shine Club or any concerted religious activity held on the school grounds during school hours. Insofar as the equal access policy permits such activity, it is unconstitutional. We also affirm the judgments refusing to enjoin the enforcement of the Oklahoma voluntary prayer statute, Okla.Stat. tit. 70, § 11–101.1 (1981), and the distribution of Bibles on school property. We reverse the denial of compensatory and punitive damages. On remand the court should consider an award of compensatory damages that is reasonable in light of the nature and extent of the particular invasion of Bell's and McCord's rights under the First Amendment. The court should also consider whether the actions of the individual defendants manifested a reckless or callous indifference for those rights. Finally, the court should determine and enter an award of appropriate attorneys fees to the Oklahoma ACLU for this appeal. The costs of this appeal will be borne by the District.

Affirmed in part, reversed and remanded in part.

BARRETT, Circuit Judge, dissenting in part.

I write separately because I am concerned that the district court likely may, upon remand, feel compelled to instruct the jurors that they may return *any* amount of damages based upon the bare deprivation of the plaintiffs' First Amendment rights. Although the majority recognizes this problem in quoting from the *Dellums* case—a damage award "must be proportional to the loss involved insofar as it seeks to compensate intangible injuries. The jury cannot simply be set loose to work at its discretion informed only by platitudes about priceless rights," maj. op. at 1411—it offers no guidance whatsoever to the district court for purposes of instructing the jury as to the measure of damages flowing from the bare deprivation. I can only assume that, because the deprivation is constitutional in nature, the jury is to infer that the award itself must be of "constitutional" magnitude. Furthermore, because I read *Carey* as establishing nonpresumption of damages as the rule rather than the exception, and because I believe that the interests protected in *Carey* are analogous to the interests at stake here, I dissent from that portion of the majority opinion which would award the plaintiffs substantial damages without proof of actual injury.

In *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), it was not disputed that the students' procedural due process rights had been violated. The sole issue before the Court was the proper measure of damages. The students argued that substantial damages should be awarded for the violation of their constitutional rights whether or not any injury was caused by the deprivation. *Id.* at 254, 98 S.Ct. at 1047. Furthermore, the students argued that even if § 1983 was enacted primarily to compensate persons for injuries caused by the deprivation of constitutional rights, the deprivation itself could be presumed to cause some injury. *Id.* The

Supreme Court disagreed with both contentions, and analyzed the issue in a manner which I believe applies equally to the facts of the present case.

The Court began its analysis with a conclusion reached by the Court of Appeals that was not disputed by the parties: that if, upon remand, the defendants could prove that plaintiffs would have been suspended even if a proper hearing had been held, then the plaintiffs would not be entitled under § 1983 to recover damages to compensate them for injuries caused by the suspension. Under these circumstances, the Court of Appeals reasoned and the Supreme Court agreed that "the failure to accord procedural due process could not properly be viewed as the cause of the suspensions." *Id.* The award of damages under such circumstances would constitute a windfall, rather than compensation, to the plaintiffs. *Id.*

The Court then turned to the Court of Appeals' further holding that the plaintiffs could recover substantial damages for "the injury which is inherent in the nature of the wrong," (citation omitted), even if their suspensions were justified and even if they failed to prove that the deprivation actually caused them some real, though intangible, injury. *Id.* at 260–261, 98 S.Ct. at 1050–1051. Although the Supreme Court agreed that "in addition to protecting against unjustified deprivations, the Due Process Clause also guarantees the 'feeling of just treatment' by the government," *id.* at 261, 98 S.Ct. at 1051, it disagreed with the further conclusion that damages for violation of the latter guarantee may be presumed— i.e., that general damages would then be awardable—as is the case in a defamation *per se* action. According to the Court, defamation *per se* at common law was "an oddity of tort law, [allowing] recovery of purportedly compensatory damages without evidence of actual loss," *id.* at 262, 98 S.Ct. at 1051, *quoting Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974). The Court did not consider it reasonable to assume that every deprivation of procedural due process, regardless how minor, was inherently as likely to cause distress as the publication of material defamatory *per se* was to cause distress and injury to reputation, when the causal connection between the deprivation and the distress was at best ambiguous. *Id.* 435 U.S. at 263, 98 S.Ct. at 1052. Also of significance in the Court's reasoning was the fact that mental and emotional distress is a personal injury well-known to the law and capable of proof through a showing of the nature and circumstance of the wrong and its effect on the plaintiff. *Id.* at 263–264, 98 S.Ct. at 1052–1053. Consequently, the Court held that while a bare deprivation of procedural due process could support an award of nominal damages ($1.00), it could not support an award of substantial damages without proof that the deprivation caused emotional distress or some other real, although intangible, injury.

Inasmuch as presumed damages were at common law "an oddity of tort law," it is fair to conclude that nonpresumption of substantial damages for violations of constitutional rights is the rule rather than the exception in § 1983 actions. It is in this context that we must consider the facts of the present case in relation to the interests at stake.

Here, as in *Carey,* in the posture in which this case is before us, there is no proof of injury stemming from the bare deprivation of plaintiffs' constitutional rights. Plaintiffs here sought $20,000 in actual damages for the alleged infringement of their First Amendment rights, but their only *proven* damages were those stemming from the actions of third parties—hair pulling, house burning, and various threats. The district court properly denied plaintiffs any damages for these injuries for that very reason—i.e., that the injuries alleged were caused by third parties, not by the District. Nonetheless, in seeking compensation for these injuries, it is clear that the plaintiffs *themselves* at least believed these injuries to be their compensable injuries flowing from the actions of the District. Consequently, the exact nature and extent of the plaintiffs'

injuries, as well as the causal link between the actions of the district and what, if any, injuries the plaintiffs suffered as a result of those actions, is ambiguous. In the words of the Supreme Court, this is an ambiguity which "provides additional need for requiring the plaintiff to convince the trier of fact that he actually suffered distress because of the denial of [the First Amendment right] itself." *Carey*, 435 U.S. at 263, 98 S.Ct. at 1052.

Furthermore, the interest at stake in *Carey* is analogous to the interest at stake here. Although the majority acknowledges that procedural due process protects not only the deprivation itself but the *mistaken or unjustified* deprivation of life, liberty, or property, maj. op. at 1409, it seems to imply that there is nothing substantive, nothing touching upon an individual's feelings and emotions, that inheres in the concept of procedural due process. The Supreme Court, however, rejected any such notion in *Carey*, recognizing "that a purpose of procedural due process is to convey to the individual a feeling that the government has dealt with him fairly, . . . ." 435 U.S. at 263, 98 S.Ct. at 1052. *Accord Fuentes v. Shevin*, 407 U.S. 67, 81, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972). Thus, the plaintiffs in *Carey* were not precluded from being awarded damages for believing that they had been treated unfairly; they simply were required to prove the damages flowing from such belief.

It taxes the imagination, then, to attempt to differentiate "the feeling of being treated fairly" from the "freedom of con-

science" uniting the cluster of interests at the heart of the First Amendment.[1] This is not to say, however, that the interests protected by the right to vote are not also analogous to either of these interests. In effect, what the majority is saying is that it "hurts" more if one's "freedom of conscience" or his right to vote is infringed upon than it does if one's "feeling of being treated fairly" is infringed upon. In my mind, such distinctions are wholly artificial, in no way serving to enhance the purpose behind § 1983 of compensating *injury*. All of these interests, in a general way, assure an individual the feeling of fair treatment. To that extent, the interests at issue here are analogous to the interests at issue in *Carey*. Consequently, the plaintiffs here should be required to prove their damages.

Moreover, the majority is simply incorrect when it states that in *Corriz v. Naranjo* this Court held, *without elaboration*, "that presumed damages are available for violations of substantive constitutional rights." Maj. op. at 1409. On the contrary, the majority opinion in *Corriz* went to great lengths to justify the award of substantial damages without proof of actual injury:

In any event, *plaintiff produced sufficient evidence of actual damages in this case to justify a substantial compensatory award* under Count One. Plaintiff proved his medical expenses and loss of earnings. He testified that he was afraid that he might go to prison during the period that the false charges

---

1. The majority states that the political, social, and religious interests inhering within the First Amendment are not to be distinguished for purposes of a damages analysis under § 1983. Maj. op. at 1412 n. 22. If *Carey* directs us to consider "the interests protected by a particular constitutional right," 435 U.S. at 258, 98 S.Ct. at 1049, however, then I see no reason why we should not also distinguish within the First Amendment itself the various interests protected. While one might be able to analogize the protections of the Free Speech Clause to voting rights protections, insofar as both seek to protect an individual's affirmative rights to public participation and public statement, the Establishment Clause operates more in a negative fashion, acting as a

wall between church and state and not relying for its implementation upon the deprivation of any individualized right. Although procedural due process operates in the context of individualized rights, one could argue that it, like the Establishment Clause, operates negatively, or indirectly, in that it establishes a sort of minimal hurdle, or wall, which state processes must clear in order not to run afoul of the Constitution. As I state in the body of my dissent, however, such artificial distinctions can only lead to confusion and can in no way further the general purpose behind § 1983 of compensating *injury*. *Wood v. Strickland*, 420 U.S. 308, 319, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975).

were pending; he lost interest in recreational activities; he can only do light work; he has suffered personality changes and has lost confidence in himself; he has begun to drink heavily; he has a constant irrational fear of police officers; he has trouble sleeping and he has a recurring nightmare in which the police shoot at him and his brother and kill his brother. A psychiatrist testified that plaintiff suffers from traumatic neuroses from which he may never recover and recommended a year of therapy. Defendants called no witnesses to rebut the evidence of psychological injury. *Although some of these damages are not quantifiable with precision, they are nevertheless actual damages which could support the compensatory award in this case.*

667 F.2d at 898 (emphasis added).

In my view, the Fifth Circuit followed the correct approach in First Amendment cases in *Familias Unidas v. Briscoe*, 619 F.2d 391, 402 (5th Cir.1980), where, in upholding a denial of substantial damages, the court concluded:

> Irma Torrez seeks $10,000 damages for violation of her association rights. The district court found, however, that Torrez failed to prove any actual, compensable injury stemming from the receipt of the section 4.28 demand for disclosure. After a thorough review of the record, we cannot conclude that this finding was clearly erroneous.

Finally, although any injuries flowing from a denial of the Establishment Clause violation here probably will be intangible—mental and emotional distress—as the Supreme Court recognized in *Carey* such injuries are well-known to the law and may be evidenced by one's conduct and observed by others. 435 U.S. at 264 n. 20, 98 S.Ct. at 1052 n. 20. In the last analysis, as the Fifth Circuit implicitly recognized in *Familias Unidas*, there must be some rational basis to guide jurors in measuring damages.

Upon remand, the plaintiffs should be required to prove the damages resulting from the denial of their First Amendment rights. Absent such proof, they would be entitled to recover nominal damages only, not to exceed one dollar. *See Carey*, 435 U.S. at 267, 98 S.Ct. at 1054.